Scott D. Tenley (Cal. Bar No. 298911)
William M. Odom (Cal. Bar No. 313428)
**ZWEIBACK, FISET & ZALDUENDO, LLP**
315 W. 9th Street, Suite 1200
Los Angeles, California 90015
Telephone: (213) 266-5170
Email: scott.tenley@zfzlaw.com
Email: william.odom@zfzlaw.com

Attorneys for Plaintiffs
PRACTICAL MAGIC, LLC and
ANGEL VALLEY PRODUCTIONS, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

PRACTICAL MAGIC, LLC; and
ANGEL VALLEY PRODUCTIONS,
LLC,

             Plaintiffs,

        v.

GENEVIEVE VON PETZINGER,

             Defendant.

Case No.

**COMPLAINT FOR:**

1. Breach of Contract
2. Breach of the Implied Covenant of Good Faith and Fair Dealing
3. Declaratory Judgment
4. Promissory Estoppel
5. Fraudulent Inducement
6. Fraud – Int'l Misrepresentation
7. Fraud – Concealment
8. Fraud – False Promise
9. Fraud – Negligent Misrepresentation
10. Negligence
11. Int'l Interference with Contractual Relations
12. Int'l Interference with Prospective Economic Advantage
13. Negligent Interference with Prospective Economic Advantage
14. Unjust Enrichment
15. Unfair Business Practices (Bus. & Prof. Code § 17200 *et seq.*)

COMPLAINT

1    Plaintiffs PRACTICAL MAGIC, LLC ("Practical Magic") and ANGEL
2    VALLEY PRODUCTIONS, LLC ("Angel Valley") (collectively, "Practical Magic"),
3    by and through their counsel of record, Zweiback, Fiset & Zalduendo, LLP, for their
4    Complaint against defendant GENEVIEVE VON PETZINGER ("Defendant"), hereby
5    allege as follows:

6                                **NATURE OF THE CASE**

7         1.    This case arises out of a fraudulent scheme by a self-proclaimed
8    "paleoanthropologist" and "rock art researcher" – defendant Genevieve von Petzinger
9    – to dupe an award-winning Hollywood production studio into producing a non-profit,
10   science-based docuseries – "The First Signs" – that she hoped would promote and
11   publicize her unique theories and research about prehistoric cave art.  Once production
12   started, however, credentialed scientific advisors to the production handpicked by
13   Defendant did not support, and vocally disagreed with, Defendant's theories and
14   interpretation of her research, potentially jeopardizing the personal financial benefits
15   and increased notoriety, particularly within the scientific and academic communities,
16   Defendant hoped to obtain by participating in the docuseries.  As a result, Defendant
17   purposefully withheld her signature from an essential production-related contract she
18   had promised to negotiate and execute in good faith, intending that it would either cause
19   the production to shut down entirely or force the production company to cede full
20   creative control to Defendant.  Either way, Defendant was determined to silence, at all
21   costs, any legitimate scientific voices questioning her theories and research, and by
22   extension, threatening her ability to monetize those theories and research.

23        2.    Plaintiffs – critically acclaimed production group Practical Magic and
24   Angel Valley Productions (collectively, "Practical Magic") – would never have agreed
25   to participate in any project with Defendant in the first place, let alone a not-for-profit
26   project, had Defendant not made numerous material misrepresentations and omissions
27   both before and during the production of The First Signs.

28

3.     First, Defendant made false statements to Practical Magic and omitted material facts about her academic credentials.  Defendant repeatedly represented that she would soon be earning her Ph.D. degree, which was material to Practical Magic's decision to become involved in the Series.  This was especially so after The First Signs became a non-profit project and Defendant was appointed as the Project Leader – it was critical that the Project Leader have the support of an accredited university consistent with the educational nature of the project.  Practical Magic later learned that Defendant, on information and belief, had been dismissed or otherwise separated from her Ph.D. program without receiving her degree, which Defendant did not timely disclose.

4.     Second, Defendant made false statements to Practical Magic and omitted material facts about her ability to gain access to highly protected prehistoric cave sites located throughout Europe.  The entire premise of The First Signs centers around exploring caves containing anthropologically significant art, access to which is strictly regulated by local government authorities.  Defendant represented that she had sought permits for a production crew to access cave sites previously, was familiar with the process, and was readily competent to manage a large volume of permit applications in connection with the production.  This was material to Practical Magic because – especially after The First Signs became non-profit – the project would need a diligent and competent professional researcher to seek and secure access to important cave sites.  Defendant spectacularly failed to deliver on these promises.  Despite assuring Practical Magic for months that she was on top of the permit application process, Practical Magic discovered mere weeks before the commencement of principal photography that Defendant had, in fact, secured almost none of the site permits that she had represented she would secure or was in the process of securing.  In some cases, Defendant had not even initiated the process, which takes months, preventing the production from ever filming at those locations.  This caused the rest of the production staff to have to scramble to rescue the project and find cave sites the crew could access,

1  resulting in a costly rescheduling of the start of filming from continental Europe to the
2  United Kingdom.

3       5.    Third, Defendant made false statements to Practical Magic or otherwise
4  deliberately mischaracterized her relationships with key figures in positions of
5  authority at certain cave art sites.  Defendant specifically represented that she was
6  friends with, or otherwise had a sufficiently positive relationship with, particular people
7  who she could leverage to get access for the production.  In one instance, the person
8  who Defendant said was her friend, in fact, denied the production access to the cave
9  systems he oversees ***because*** Defendant was involved with the project.  Otherwise,
10 Defendant failed to deliver in myriad ways on nearly all these promised relationships.

11      6.    Fourth, Defendant misrepresented her own competence, professionalism,
12 and experience in television production.  Defendant assured Practical Magic that she
13 had worked on documentary shows similar to The First Signs in the past and that she
14 understood the logistics and human factors involved.  However, Defendant would later
15 admit on a hot mic that she has not done much television – and it plainly showed.
16 Defendant mistreated and belittled other members of the talent and crew members.
17 Defendant repeatedly, even after warnings, attempted to overrule creative decisions
18 made by Practical Magic and told other members of the production staff to disregard
19 or otherwise contravene Practical Magic's directions (even though she had
20 contractually assigned all creative control to Practical Magic).  Defendant would
21 frequently fail to allow crew members to take mandatory breaks and otherwise
22 exhibited a disregard for the well-being of the crew.  Additionally, Defendant made an
23 unwelcome sexual advance on a set medic under the guise of a medical problem, and
24 on at least one occasion, showed a different member of the production staff an
25 inappropriate image on her phone.  Despite her assurances of professionalism and
26 competence, Defendant was an unmitigated disaster with respect to the production.

27      7.    Despite Defendant's lies, misrepresentations, material omissions,
28 unprofessionalism, and incompetence, many of which are still under investigation,

1  Practical Magic was able to move the docuseries into production.  However, once in

2  production, credible and credentialed scientific advisors to the production – all of

3  whom were selected by Defendant and one of whom was even related to Defendant –

4  vocally disagreed with Defendant's theories and interpretations about prehistoric cave

5  art for which Defendant has gained notoriety.

6       8.    Defendant then plotted to silence her critics by obtaining creative control

7  over the docuseries or shutting it down entirely.  To do so, Defendant notified the

8  philanthropic foundation that had funded the docuseries – the John Templeton

9  Foundation – that she had not signed an agreement releasing her image rights to

10  Practical Magic.  Defendant made this claim even though she caused Practical Magic

11  to believe, and acted as if, she had executed the agreement, including requesting and

12  accepting at least $45,000 in payments pursuant to that agreement.

13       9.    As a result of Defendant's bad faith conduct, the John Templeton

14  Foundation froze the remainder of its funding for The First Signs – over $1.4 million -

15  thereby effectively halting the production in its tracks, at great financial, vocational,

16  and reputational damage to Practical Magic.

17       10.    Accordingly, through this lawsuit, Practical Magic seeks relief from the

18  Court that would compensate Practical Magic for the financial, vocational, and

19  reputational damages suffered as a result of Defendant's fraud and interference, allow

20  Practical Magic to resume the docuseries without Defendant and publicly disclose the

21  legitimate scientific debate over the significance of prehistorical cave art, and prevent

22  Defendant from further interfering with Practical Magic's rights in bad faith.

23                                **PARTIES**

24       11.    Plaintiff PRACTICAL MAGIC, LLC is a California limited liability

25  company with its principal place of business located at 59 E. Orange Grove Ave.,

26  Burbank, California 91502.  Practical Magic is co-owned by Matthew Lewis and Amy

27  Bloom.

28

COMPLAINT

1  12.    Plaintiff ANGEL VALLEY PRODUCTIONS, LLC is a California limited
2  liability company with its principal place of business located at 59 E. Orange Grove
3  Ave., Burbank, California 91502.  Like Practical Magic, Angel Valley is co-owned by
4  Matthew Lewis and Amy Bloom.  Practical Magic and Angel Valley will collectively
5  be referenced as "Practical Magic."
6  13.    Defendant GENEVIEVE VON PETZINGER is a citizen of Canada,
7  residing at 1406 Beach Dr., Victoria, British Columbia, V8S 2M4, Canada, who can
8  be contacted and served through her counsel in this matter, Frankfurt Kurnit Klein &
9  Selz PC, 2029 Century Park East, Los Angeles, CA 90067.

10  ## JURISDICTION AND VENUE

11  14.    Federal subject matter jurisdiction exists pursuant to 28 U.S.C.
12  § 1332(a)(2) (diversity jurisdiction) because the amount in controversy exceeds
13  $75,000 and this case is between "citizens of a State and citizens or subjects of a foreign
14  state."

15  15.    This Court has personal jurisdiction over Defendant because this case
16  arises out of Defendant's numerous contacts with the State of California, which are
17  sufficient such that the exercise of jurisdiction in this forum does not offend traditional
18  notions of fair play and substantial justice.  Specifically, Defendant directed at least the
19  following contacts toward the State of California, which relate to or form the basis of
20  Practical Magic's claims:

21  a.    Defendant executed a contract with Practical Magic, which she
22  knew to be a citizen of California.  (*See* Exhibit A.)

23  b.    This same contact prescribes that California law governs any
24  disputes arising thereunder.  (Exhibit A, ¶ 7.)  Accordingly, by entering into this
25  contract, Defendant purposefully availed herself of the benefits and privileges of the
26  laws of the State of California.

27  c.    By entering into this contract, Defendant agreed to work on the
28  production of a film for which she knew the editing, production work, and advertising

would be carried out by Practical Magic in California.  (*See Roth v. Garcia Marquez*, 942 F.2d 617, 622 (9th Cir. 1991) (finding jurisdiction, in part because "the contract concerned a film, most of the work for which would have been performed in California. Though the shooting most likely would have taken place in Brazil, all of the editing, production work, and advertising would have occurred in California.").)

d.  Defendant participated in pitching the docuseries at issue to parties with extensive presence in California, such as Discovery Communications, LLC.

e.  Defendant traveled to, and stayed in, California for a near-week-long creative summit in Lake Arrowhead for The First Signs.  At this summit, Defendant made or repeated many of the misrepresentations that form the basis of certain of Practical Magic's claims.

f.  Throughout the events described in this Complaint, Defendant directed a large number of telephone calls, text messages, e-mails, chat messages, and other types of electronic correspondence toward people whom she knew to be citizens of California.  Some of these electronic communications contained misrepresentations that form the basis of certain of Practical Magic's claims.

g.  Defendant also participated in numerous Zoom (or other platforms) conferences with people who she knew to be citizens of California.

h.  Defendant made numerous misrepresentations to individuals who she knew to be citizens of California.

i.  Defendant caused injury which was primarily felt by Practical Magic and its employees in California.

16.  Accordingly, (i) Defendant purposefully directed her activities toward, and consummated transactions with, California residents, including Plaintiffs; (ii) Defendant performed acts by which she purposefully availed herself of the privilege of conducting activities in California, thereby invoking the benefits and protections of its laws; (iii) Practical Magic's claims arise out of or relate to Defendant's forum-related

1    activities; and (iv) the exercise of jurisdiction over Defendant in California is
2    reasonable.

3          17.    Venue is proper in the Central District of California pursuant to 28 U.S.C.
4    § 1391(b)(2) because "a substantial part of the events or omissions giving rise to the
5    claim occurred" in this judicial district, including, but not limited to, statements made
6    by Defendant at numerous in-person conferences that took place in Lake Arrowhead,
7    California.

8          18.    Alternatively, venue is proper in the Central District of California
9    pursuant to 28 U.S.C. § 1391(b)(3) because Defendant is subject to personal
10   jurisdiction in this Court.

11                              **FACTUAL ALLEGATONS**

12         19.    This case concerns the production of the non-profit documentary series,
13   entitled "The First Signs" ("The First Signs" or the "Series").  The subject of The First
14   Signs is cave art – symbols and other images left in caves by ancient humans around
15   the world, with a specific emphasis on a type of cave art referred to by Defendant as
16   "Geometric Signs."  The below image is one such example of this cave art:[1]



17
18
19
20
21
22
23
24
25
26

27   _____
28   [1] *See* https://ideas.ted.com/what-the-mysterious-symbols-made-by-early-humans-can-teach-us-about-how-we-evolved/

20.    The Series was inspired by a TED Talk presented by Defendant in November 2015, called "Why are these 32 symbols found in ancient caves all over Europe?" (including follow-up TED Talks/other presentations), as well as by a book authored by Defendant in May 2016, called "The First Signs: Unlocking the Mysteries of the World's Oldest Symbols."

21.    Defendant is a Canadian citizen who holds herself out to the world as a "paleoanthropologist" and "rock art researcher."  On information and belief, Defendant holds a Master of Arts degree in anthropology from the University of Victoria.  Around the time she delivered her TED Talk in 2015, Defendant publicly represented that she was "finishing up her doctorate at the University of Victoria."[2]  However, on information and belief, Defendant was dismissed or otherwise separated from her Ph.D. program without receiving her degree.  Nonetheless, Defendant thereafter continued, and continues to this day, to hold herself out as a "researcher" in the field of cave art – a term of art within the international anthropological community referring to an academic who has earned or is actively working toward his or her doctoral degree.  Indeed, at the time of the filing of this Complaint, Defendant's LinkedIn profile states "University of Victoria Doctor of Philosophy – PhD Anthropology 2010 – 2019" with no indication that the degree was unearned.  However, shortly before the filing of this Complaint, Practical Magic called the University of Victoria Registrar's Office and asked whether Defendant had been awarded a Ph.D. degree, and was advised that she has not.

22.    Defendant's TED Talk theorized that she had discovered some kind of pattern for interpreting or otherwise understanding the thirty-two distinct geometric symbols found in different caves all over the world, even though the ancient humans responsible had no proven way of communicating with, or even knowing about, one

---

[2] *See* https://www.ted.com/speakers/genevieve_von_petzinger

another.[3]  Defendant's theory was entertaining and intriguing, but would prove to be unscientific and substantially lacking support from established authorities in the field.

23.    In any case, after her TED Talk became popular, Defendant became interested in the possible production of a motion picture documentary or docuseries inspired by it.  Because Defendant lacked the resources or the expertise required to produce any kind of motion picture, Defendant sought out the attachment of a professional production studio – Practical Magic.

24.    Practical Magic, founded in 2012, is a full-service production studio with an in-house creative engineering division.  It offers traditional production services, as well as cutting-edge technology such as virtual reality, augmented reality, volumetric media, and other experimental media.  Practical Magic has been involved in projects such as the Grease® Augmented Reality experience, The Meg® "Submersive" Virtual Reality experience, Dunkirk® Virtual Reality, Ben Affleck and Matt Damon's The Runner® competition series, and Google ATAP's Help®, which won the Gold Lion award at the Cannes Film Festival for technological innovation.  Practical Magic has received numerous industry awards, recognitions, and accolades.  In the past five years alone, Practical Magic has produced at least thirty hours of top-quality documentary television, which has been broadcast all over the world.  Practical Magic's principal office is located in Burbank, California.

A.    **2017 - 2020: Defendant Misrepresents or Conceals Material Facts to Induce Practical Magic into Agreeing to Pitch and Produce the Series**

25.    Practical Magic was introduced to Defendant in early 2017 through a mutual acquaintance, who connected them because Defendant was interested in the production of a documentary or docuseries inspired by her TED Talk, and Practical Magic had a substantial amount of experience producing fact-based documentary media.

---

[3] *See* https://www.ted.com/talks/genevieve_von_petzinger_why_are_these_32_symbols_found_in_ancient_caves_all_over_europe

26.    Defendant gave Practical Magic every reason to believe that she was a well-respected and influential researcher with numerous relationships that she could leverage for the benefit of the production.  Defendant further caused Practical Magic to believe she was a competent, serious professional and academic who would use her best efforts to ensure the Series was successful.

27.    From Practical Magic's first meeting with Defendant, throughout the process of pitching the Series from 2017 to 2020, Defendant made numerous affirmative misrepresentations to Practical Magic intended to induce Practical Magic into becoming the attached producer of The First Signs, as well as concealed obviously material facts that would have dissuaded Practical Magic from agreeing to become involved with the Series.  Specifically, among others:

a.    Defendant represented to Practical Magic that she was nearing completion of her Ph.D. program and would be receiving a doctorate degree in anthropology before the release of the docuseries.  Defendant expressly stated in a January 2020 e-mail that she had been having a "crazy week" because she was "teaching at [her] university and wrapping up [her] PhD…"  Practical Magic later discovered that, on information and belief, Defendant had been dismissed or otherwise separated from her Ph.D. program without receiving her degree, which she did not disclose in a timely manner.

b.    Defendant assured Practical Magic that she would be able to secure permits for the film crew to access cave systems of great importance to the Series.  For many of these cave systems, the relevant authority requires a qualified researcher holding a Ph.D. to sign off on the application, reinforcing Defendant's misrepresentations that she was nearing the completion of her Ph.D.  Defendant assured Practical Magic that she was intimately familiar with the process because she had supposedly been through it in connection with prior projects.  Defendant promised Practical Magic that she would enable the production to enjoy unrestricted access to important cave sites – sites which are carefully guarded and regulated by foreign

1  governments given their historical significance and fragility.  Practical Magic would

2  later discover – at great cost – that Defendant is either not qualified or not competent

3  to prepare these permit applications.

4  c.  Defendant mischaracterized the extent of her relationship with

5  specific individuals in authority positions in certain local governments, who would be

6  critical in determining whether the production could access certain sites.  For instance,

7  Defendant advised Practical Magic and Folklight that "a lot of the time it's going to be

8  mine and [a member of the Science Advisory Panel]'s personal relationships with the

9  researchers and government officials who control the sites that will get us the full

10  access [to the caves] we want."  Practical Magic would later discover that these

11  relationships either did not exist, or were far less amicable at the time than Defendant

12  represented. As a specific example, Defendant represented that Gustavo Sanz, a

13  government official in Cantabria, Spain, was her "friend."  However, Sanz made the

14  decision to ***deny*** the production access to one or more cave systems in Cantabria ***solely***

15  ***because Defendant was involved*** (he expressed this in a WhatsApp text message).

16  Defendant routinely represented that she had many relationships like this, but Practical

17  Magic would come to learn that Defendant is generally poorly regarded by many of her

18  peers and those she describes as peers.

19  d.  Defendant represented that she had prior experience with the

20  production of similar television documentaries, so she was familiar with the process.

21  Defendant made other representations completely mischaracterizing the extent of her

22  knowledge, skill, and experience in producing documentary media.  During filming,

23  Defendant would later be captured on a hot mic expressing, under her breath, that she

24  has worked on very few television projects – a reality that had become obvious to

25  Practical Magic because Defendant's conduct was more akin to sabotaging the Series

26  than producing it.

27  28.  These misrepresentations were all material to Practical Magic's decision

28  to become involved with the Series at all.  The primary logistical hurdle the production

would face would be getting the film crew access to cave sites with anthropologically significant drawings or symbols.  In every single case, these cave sites are strictly protected and regulated by the relevant local government.  Practical Magic reasonably had no interest in producing a docuseries about cave art without being able to get access to important caves.  Defendant's assurances that she would be able to secure access comforted Practical Magic.  Relatedly, Defendant's representations that she would imminently be finishing her Ph.D. led Practical Magic to believe that she was, or would soon become, a qualified researcher authorized to submit permit applications for certain regions.  More fundamentally, Defendant's representations that she would soon have her Ph.D. led Practical Magic to believe that it was signing up for a fact-based, scientifically accurate portrayal of cave art.

29.    In reliance on these representations, bolstered by the positive reception of Defendant's TED Talk, the project appeared legitimate and attractive to Practical Magic.  As such, Practical Magic – at its own expense – prepared creative pitch materials, including a pitch tape, and began pitching the Series to networks.

**B.    July 2020: Practical Magic Secures a Development Deal with the Science Channel**

30.    Practical Magic submitted the idea and pitch tape for the Series to Discovery Communications, LLC ("Discovery") in connection with the Science Channel.  Practical Magic had an existing relationship with Discovery that it leveraged for this purpose.  Initially, Discovery's interest was only lukewarm, but after much persistence and the preparation of additional creative pitch material by Practical Magic, Discovery ultimately agreed to a development deal for The First Signs.

31.    On or around July 29, 2020, Practical Magic and Discovery executed both a Commission Master Agreement and a Development/Commission Attachment for the Science Channel (collectively, the "Science Channel Development Deal").  Pursuant to these agreements, Discovery agreed to fund the development of The First Signs in

1  exchange for being granted the exclusive option to order a pilot or a series, among other
2  terms.

3          32.     In pitching The First Signs to the Science Channel, Practical Magic relied
4  not only on their own industry reputation as respected and acclaimed producers, but
5  also on the representations Defendant had made to Practical Magic (many of which
6  were later discovered to be false).  For instance, Practical Magic relayed to the Science
7  Channel that Defendant, who would be involved in the project, was nearing completion
8  of her doctorate degree, had positive relationships with other authority figures in the
9  field, and had access to cave systems of anthropological significance around the world.
10  The fact that Practical Magic relayed these representations to the Science Channel
11  further demonstrates its reliance on the representations.

12         33.     Indeed, one of the terms in the Science Channel Development Deal was
13  that Practical Magic would secure "[a] holding agreement . . . between Producer and
14  Genevieve von Petzinger ("Talent"), to ensure that if Company desires to produce the
15  Program, such Talent will be willing and available to participate in the program."

16  **C.     July 2020: Defendant Executes the Attachment Agreement**

17         34.     Per the Science Channel's requirement, Practical Magic prepared an
18  Attachment Agreement for Defendant to execute.  In order for Practical Magic to
19  undertake the significant risk and investment of developing and producing a
20  docuseries, Practical Magic required Defendant to grant Practical Magic the exclusive
21  right to produce and exploit the docuseries upon completion.  Defendant did so by
22  signing the July 2020 Attachment Agreement.

23         35.     On or around July 30, 2020, Defendant signed an Attachment Agreement
24  designating Practical Magic as the Executive Producer of The First Signs, a true and
25  correct copy of which is attached hereto as **Exhibit A** (the "Attachment Agreement").[4]

26  _____

27  [4] Only Angel Valley is a named party to the Attachment Agreement; however, the
    Agreement states that "Producer may assign any or all Producer's rights and
28  obligations hereunder to any entity owned and/or controlled by Producer required for
    the development, production, distribution and/or other exploitation of the Series," and

The Attachment Agreement "sets forth the material terms of the agreement between [Practical Magic] and [Defendant] in connection with the possible development, production, distribution and/or other exploitation of" The First Signs.  (*Id.*, preamble.)

36.   Pursuant to the Attachment Agreement, in consideration for Practical Magic's "development services and reasonable efforts to obtain third party [] financing," Defendant agreed that Practical Magic "shall have the exclusive right to represent the Series during the period" until one year after the date Defendant had signed.  (*Id.*, ¶ 1.)  However, "[i]n the event there is ongoing activity with respect to setting up the Series," this "Attachment Period" was to be extended by "the time it takes for such ongoing activity to either cease or conclude in satisfactory deals."  (*Id.*, ¶ 1.)

37.   Further, Defendant agreed to three key provisions, which were to take effect in the event that Practical Magic or any representative of Practical Magic elected to "submit the Series to a Third Party during the Attachment Period and such Third Party agrees to finance the . . . the Series."  (*Id.*, ¶ 2.)  Specifically, Defendant agreed that, if Practical Magic secured funding for The First Signs, then:

a.   Practical Magic "shall be attached as the production services company," and as the "Executive Producers of the Series," and Practical Magic "shall have full and complete approval over the services to be rendered . . . and the terms of the agreement for such services" (*Id.*, ¶ 2);

b.   All services rendered by Defendant in connection with the Series "shall be rendered as a work-for-hire," and Practical Magic "shall own the results and proceeds of such services" as well as "the exclusive right to use intellectual property owned or controlled" by Defendant "utilized in conjunction with the Series," with "***the***

---

therefore, Angel Valley and Practical Magic are interchangeable in this context and will be referenced throughout this Complaint as "Practical Magic."  (*Id.*, ¶ 5)

*sole right to exploit same in all media throughout the world in perpetuity*" (*Id.*, ¶ 2);[5] and

        c.    Defendant "shall be attached as on-camera talent on terms (including fees and credit) *to be negotiated in good faith* with the Third Party" (*Id.*, ¶ 2).

38.    The Attachment Agreement further stipulated: "No party hereto shall have the right to proceed with the development, production, distribution and/or other exploitation of the Series with a Third Party until all other parties have given their full and complete approval to the terms of their respective agreements." (*Id.*, ¶ 2.)

39.    Relatedly, the Attachment Agreement stipulated: "The parties agree that in entering into agreements hereunder *they shall act reasonably and in good faith*, taking into consideration their respective precedents and stature in the entertainment industry and *neither party hereto shall unreasonably withhold his/her approval so as to frustrate the development, production, distribution or other exploitation of the Series*." (*Id.*, ¶ 2.)

40.    Additionally, by signing the Attachment Agreement, Defendant agreed "to execute such further documents (after reasonable opportunity to review the same and comment thereon) not inconsistent herewith as the other party may from time to time deem necessary and desirable to carry out the purposes of this Agreement." (*Id.*, ¶ 9.)

41.    Finally, the Attachment Agreement stated: "It is contemplated that a more formal agreement may be entered into by the parties hereto covering the subject matter hereof, which agreement shall contain such *standard terms as are customary in Producer's agreements and the Los Angeles television industry* for agreements of this type and parties of this stature, subject to good faith negotiations not inconsistent with

---

[5] All emphasis throughout is added unless otherwise noted.

1   the terms specified herein.  ***Unless and until such more formal agreement is executed,***
2   ***this Agreement shall constitute a binding contract***."  (*Id.*, ¶ 10.)

3      42.   Practical Magic's securing a development deal with the Science Channel
4   qualified as obtaining third-party financing pursuant to Defendant's Attachment
5   Agreement. (Exhibit A, ¶ 2.)  As such, Practical Magic's attachment to The First Signs
6   was triggered, and the rights to The First Signs transferred to Practical Magic
7   accordingly.  (*See supra*, ¶ 37.)  This remained the case continuously while the Series
8   was in development with the Science Channel, and remains the case to this day.

9      **D.   Mid 2021: During Development, The First Signs Becomes a Non-**
10          **Profit Project**

11     43.   Practical Magic then proceeded with the creative development of The First
12  Signs under the auspices of the Science Channel throughout the latter half of 2020 and
13  early 2021.   This included preparing a fully developed and detailed treatment
14  broadening out the premise of The First Signs; preparing story ideas and storyboards
15  for six, 60-minute episodes; preparing a detailed production budget, preparing a
16  detailed production schedule, and preparing detailed biographical information on all
17  principal researchers and contributing talent.

18     44.   At some point, the Science Channel expressed that it would not be able to
19  afford the full cost of producing the Series, which could exceed $10 million.
20  Accordingly, the decision was made – with the approval of both Defendant and the
21  Science Channel – that the Series would become non-profit and that other, outside
22  funding would be sought.

23     45.   The Series appeared to Practical Magic – based on what Defendant had
24  led it to believe at the time – to be a good candidate for non-profit status.  It was to be
25  an educational, informative docuseries, led by (to Practical Magic's belief) a
26  competent, qualified, (and by that time) Ph.D.-holding researcher.   Additionally,
27  Defendant had made Practical Magic believe that she would be able to get the
28  production access to important cave sites relatively easily – a key selling point for

fundraising and sponsorship development, and for keeping the logistical cost of the production low and within the confines of a non-profit-level budget.  In reliance on Defendant's previous and ongoing misrepresentations, Practical Magic agreed to switch the Series to non-profit status and remain attached as producer.  Practical Magic genuinely believed that the Series was unique, interesting, and worthwhile, and was willing to produce it not for profit, as long as it did not lose money in the process.

46.    In doing so, Practical Magic gave up several significant financial benefits to which it would otherwise be entitled, including, but not limited to, waiving its own producer's fee ($466,422), waiving distributions revenue, and waiving any exploitation of the Series for profit.  Additionally, every single one of Practical Magic's employees worked on the Series for a reduced rate.  Furthermore, Practical Magic paid the Science Channel a $15,000 fee to cause the development rights to The First Signs to revert back to Practical Magic.  Practical Magic incurred all of these burdens and risks in reliance on Defendant's representations and material omissions.

47.    After the project became non-profit, Defendant promised Practical Magic that she would use funding she supposedly received from National Geographic to support the Series' budget.  This funding never materialized.

48.    Because The First Signs had become a non-profit project, it required a 501(c)(3) entity to act as fiscal sponsor.

**E.    February 2022: Folklight Executes the Fiscal Sponsorship Agreement**

49.    After the Series had shifted to a non-profit project, Practical Magic enlisted Folklight Film Club ("Folklight"), a 501(c)(3) non-profit independent film company, to act as the project's fiscal sponsor.  Practical Magic was aware of Folklight's existence by virtue of a prior working relationship with its Executive Director Brooke Tansley in 2011.  In the context of non-profit motion picture projects, a fiscal sponsor is a 501(c)(3) entity, separate from the producer, who helps secure funding for the project, and then receives and distributes the funds to the producer for the purpose of producing the motion picture.  Folklight agreed to act as the project's

fiscal sponsor and began working to help Practical Magic prepare applications for grant funding.

50.     Practical Magic remained attached as producer pursuant to the Attachment Agreement throughout the process of onboarding Folklight as fiscal sponsor.  (Exhibit A, ¶ 2.)

51.     On or around February 25, 2022, Folklight and Practical Magic executed a Fiscal Sponsorship Agreement, whereby Folklight agreed to receive and administer any grant funding to Practical Magic for the purpose of producing The First Signs (the "Folklight Fiscal Sponsorship Agreement"), a true and correct copy of which is attached hereto as **Exhibit B**.

52.     The Folklight Fiscal Sponsorship Agreement incorporates by reference, and makes part of the Agreement, "the proposal, treatment, and budget submitted . . . in the application for Folklight Film Club's Fiscal Sponsorship."  (*Id.*, ¶ 1.)

53.     Defendant was involved in the processing of creating and approving the budget submitted to Folklight.  Defendant actively discussed the project budget, including her own salary, with Practical Magic on multiple occasions, and agreed to a salary of $30,000.  This budget was not only seen by, but also personally submitted by, Defendant via uploading the budget herself.  Defendant's accepted salary remains in the budget to this day.  Folklight's agreement to act as fiscal sponsor to The First Signs was premised on this budget as submitted.  Defendant knew that if she wanted to further negotiate her salary, she needed to do so long before this budget was submitted and approved by Folklight.  However, Defendant did not do so.

54.     Additionally, in the Fiscal Sponsorship Agreement, Practical Magic granted Folklight a copyright license to the project and its educational outputs, "limited to uses consistent with and in furtherance of the tax-exempt purposes of Folklight and otherwise consistent with the terms of this Agreement."  (Exhibit B, ¶ 12(b).)

55.     Lastly, the Folklight Fiscal Sponsorship Agreement contains a termination provision allowing for unilateral termination only in the event of an uncured material

breach by the opposite party. (*Id.*, ¶ 19.) In the event of such termination, "all ownership rights and title to any Works ***not in dispute*** (completed or otherwise) shall vest in Folklight." (*Id.*) In other words, to the extent any dispute existed over the Works, Practical Magic would retain all ownership and other rights over those Works.

**F.** **March 2022: The John Templeton Foundation Awards a Multi-Million Dollar Grant to Folklight, Vesting Folklight with Unfettered Discretion Over Defendant's Work**

56. Defendant suggested that the production seek funding from the John Templeton Foundation, a 501(c)(3) non-profit foundation that provides funding for scientific and educational research and media. On information and belief, Defendant had some kind of pre-existing relationship with the John Templeton Foundation.

57. Practical Magic and Folklight were responsible for preparing critical components of the application and nearly all related creative concept materials. This included all the pitch materials that Practical Magic had prepared, at its own expense, in connection with the Science Channel pitch, as well as other creative materials prepared by Practical Magic, including additional tapes, imagery, story ideas, and notes.

58. The grant application submitted to the John Templeton Foundation included the same project budget submitted to Folklight, stipulating that Defendant's salary would be $30k. Defendant was heavily involved in the preparation of this grant application and, again, saw her salary in the budget. Indeed, as Project Leader, Defendant was at one time the only person with the password to the John Templeton Foundation portal through which these materials were submitted, and therefore, it all had to go through her. She reviewed and signed off on all versions of the budget submitted to the John Templeton Foundation.

59. Additionally, all documentation relevant to custody of the rights to the Series was required to be in order by the John Templeton Foundation, including Defendant's Attachment Agreement. Defendant knew that the John Templeton

Foundation required all documentation to be in order.  Defendant did not contend that the Attachment Agreement had expired or was otherwise invalid in any way.  Practical Magic, Folklight, and the John Templeton Foundation all relied on the representation of validity and sufficiency of all rights-related agreements, including the Attachment Agreement, to which Defendant did not object.  Defendant intended for Practical Magic (and the John Templeton Foundation and Folklight, for that matter) to rely on the validity of the Attachment Agreement in order to proceed with the production.  At no point did Defendant suggest that her Attachment Agreement had expired or was otherwise invalid in any way.

60.    Practical Magic leveraged its industry reputation and the influence of Practical Magic's principals to convince the John Templeton Foundation to agree to grant funding.  In other words, Defendant's introduction alone did not cause the John Templeton Foundation to fund the Series.  Instead, the John Templeton Foundation relied significantly on the materials created and submitted by Practical Magic, as well as Practical Magic's reputation as reputable, award-winning production company.

61.    The John Templeton Foundation agreed to grant funding for The First Signs project.  On or around March 11, 2022, the John Templeton Foundation and Folklight finalized a Grant Agreement, whereby the John Templeton Foundation agreed to grant Folklight $3,938,471 to fund The First Signs (the "JTF Grant Agreement), a true and correct copy of which is attached hereto as **Exhibit C**.  The John Templeton Foundation was the "Grantor" and Folklight, in its role as fiscal sponsor, was the "Grantee."  (*Id.*, p. 1.)  Folklight, funded by the John Templeton Foundation grant, would then finance the Series.

62.    The grant application materials submitted by Folklight, including a project proposal and budget, are appended as exhibits to the JTF Grant Agreement.  (*See id.*, p. 12, *et seq.*)  The budget provided that the total Talent salary was to be $181,920 (*id.*, p. 16), which included the $30k salary agreed upon for Defendant – the same as in the materials submitted to Folklight.  Defendant knew that if she wanted to further

1   negotiate her salary, she needed to do so long before this budget was submitted and

2   approved by the John Templeton Foundation.  However, Defendant did not do so.

3        63.   Furthermore, these materials designated Defendant as the "Project

4   Leader" based on the notoriety of her TED Talk and book, as well as based on her

5   purported access to cave systems and authorities around the world.  (*Id.*, p. 15.)[6]  For

6   instance, the "Executive Summary" of the project, which Defendant wrote, described

7   Defendant's purported "groundbreaking work in decoding The First Signs – ancient

8   symbols left by our ancestors in caves around the globe."  (*Id.* p. 12.)  It further

9   described the docuseries as "following [Defendant] and her team as they perform real

10  science in the real world."  (*Id.*)  Defendant portrayed herself as a member of a "cast

11  of world-class scientists" who would "descend into ancient caves" and "collect samples

12  from 40,000-year-old cave paintings."  (*Id.*)

13       64.   Defendant was appointed as the Project Leader in reliance on her

14  misrepresentations, in particular, that she would soon be getting her Ph.D. and had

15  specific relationships that could be leveraged for the benefit of the project.  In the

16  context of a non-profit project like The First Signs, the Project Leader is a critical role

17  that acts as the head of the substantive research side of the production.  This person

18  would be responsible for establishing the project's legitimacy and securing access to

19  the cave sites that formed the basis of the project.  If Practical Magic had known that

20  Defendant, on information and belief, had been dismissed or otherwise separated from

21  her Ph.D. program without receiving her degree, and was poorly regarded by many of

22  her peers, then Practical Magic would not have agreed to proceed with Defendant as

23  the Project Leader.

24       65.   Being the Project Leader did not, in any way, indicate that Defendant

25  controlled the production of the Series.  It indicated only that she was the head

26

27

28

---

[6] The John Templeton Foundation's website lists both Defendant and Matthew Lewis of Practical Magic as "Project Leaders" on The First Signs. https://www.templeton.org/grant/the-first-signs

"scientist" who would be responsible for site access.  Relatedly, the John Templeton Foundation Grant Agreement contains an important acknowledgement: "Grantor and Grantee understand that *the Project Justification and Description was written by the Project Leader*; however, they agree that *Grantee is the sponsor of the Project and Grantee shall oversee and have complete discretion with respect to the Project Leader's work* on the Project to ensure that work is consistent with and in furtherance of the tax-exempt purposes of the Project as described in the Proposal and this Agreement." (*Id.*, p. 19, ¶ 5.)

66.    In other words, Defendant ceded full discretion and control over the Series and knew this was a condition of the grant.  Defendant agreed to this term in order to induce the John Templeton Foundation, Folklight, and Practical Magic into becoming/remaining involved with the project.

G.    **March/April 2022: Defendant Initiates a Scheme Not to Sign Critical Contractual Agreements**

67.    Respondent's Attachment Agreement provides that, once the Series is funded, and Practical Magic therefore attached as producer, Defendant "shall be attached as on-camera talent on terms (including fees and credits) to be negotiated in good faith with the Third Party ('On-Camera Talent Agreement')." (Exhibit A, ¶ 2.) Indeed, it states "[n]o party hereto shall have the right to proceed with the development, production, distribution and/or other exploitation of the Series with a Third Party until all other parties have given their full and complete approval to the terms of their respective agreements." (*Id.*)

68.    Accordingly, Practical Magic provided Defendant with such an On-Camera Talent Agreement, a true and correct copy of which is attached hereto as **Exhibit D** (the "On-Camera Talent Agreement").  Every other member of the cast and crew was provided with a similar, but individualized, version of this Agreement.  Every other member of the cast and crew, besides Defendant, signed and returned their Agreement promptly upon receipt.

69.     The On-Camera Talent Agreement provided for Defendant's $30,000 salary, as determined by the budget submitted to Folklight and the John Templeton Foundation.   Additionally, the Agreement provided for Defendant a $20,000 "completion fee," which was coded against a different line item in the budget designated for such purposes.  (*Id.*, p. 1 ("RATE").)   The $20,000 completion fee provided for Defendant in this On-Camera Talent Agreement is not stated anywhere else.

70.     The On-Camera Talent Agreement further provided that this "[t]otal compensation shall be inclusive of all services rendered on the Project, including, but not limited to Executive Producer, Producer, Researcher, and On-Screen Host/Talent duties." (*Id.*, p. 1 ("ADDITIONAL TERMS").)  This provision made abundantly clear that Defendant's agreed-upon salary was intended to compensate Defendant for all services rendered to the production.

71.     Additionally, Defendant in practice was fully aware that her complete salary for the Series would be $50,000.  Practical Magic and Defendant expressly agreed that nobody else on the project would be paid $50,000 or more because that was Defendant's salary, and Defendant was the Project Leader.  Defendant would not have made such express agreement setting the salary ceiling as $50,000 unless she understood that her salary was $50,000.

72.     The On-Camera Talent Agreement also provided compensation for travel and accommodation expenses, subject to Practical Magic's approval.  (*Id.*)

73.     The On-Camera Talent Agreement specified that it was "all subject to limitations and conditions of the JTF grant." (*Id.*)

74.     The On-Camera Talent Agreement further contained a list of Practical Magic's standard terms and conditions – the "standard terms as are customary in Producer's agreements and the Los Angeles television industry" referenced in Defendant's Attachment Agreement.  (*Id.*, p. 2-3; *see also* Exhibit A, ¶ 10.)  These included, among other terms:

a.   Practical Magic having the right to direct Defendant's services (Exhibit D, ¶ 1);

b.   That the compensation rate stated above was "full and complete consideration for services and for all rights transferred" (*id.*, ¶ 2);

c.   That Defendant was entitled to be credited if she recognizably appeared in the Project (*id.*, ¶ 3);

d.   That "Producer shall be the sole and exclusive owner of all results and proceeds of Artist's services, including, without limitation, all elements created by Artist in connection with the Project and of all rights in the role or character portrayed by Artist" (*id.*, ¶ 4); and

e.   "Throughout the universe in perpetuity and in connection with the Project, unless otherwise specified herein, Artist acknowledges that Producer may use and authorize others to use and display Artist's name and likeness . . . in connection with the [Project]" (*id.*, ¶ 5).

75.   On information and belief, Defendant received a hard copy of her paperwork on-set at or around the same time as other cast members received their production paperwork, which included their respective On-Camera Talent Agreements. Multiple people witnessed her receiving a copy of her production paperwork, on information and belief, including On-Camera Talent Agreements, and On-Camera Talent Agreements were ultimately signed and returned by all of the other cast members.

76.   Additionally, Defendant had access to the project management portal in use for the production crew, which was called Monday.com. Defendant was provided access to training materials on how to use Monday.com. Part of Defendant's job duties in connection with the production included interacting with Monday.com, which contained among other things task lists and files or references to files relevant to those tasks. Defendant knew how to use Monday.com, and certainly would have been aware of her requirement to complete paperwork tasks by virtue of Monday.com, which

would include a task to complete all her paperwork, including the On-Camera Talent Agreement.   Moreover, as an Executive Producer, Defendant had more control, autonomy, and visibility regarding her documents and paperwork than any other cast member.  In that regard, Defendant held a position of trust within the overall production scheme that, along with her conduct and continued work on the production through its completion while drawing her salary, reasonably caused Practical Magic to believe Defendant had indeed executed, or otherwise would execute and subsequently upload to Monday.com, the On-Camera Talent Agreement as required in order for production to proceed.

77.    Until very recently, Defendant gave no indication whatsoever that she objected to, or wanted to negotiate, any of the terms of the On-Camera Talent Agreement.  Defendant suggested that she wanted to negotiate an agreement protecting her right to publish another forthcoming book on the topic, and suggested that her lawyer or agent was working on such agreement, but Practical Magic never received anything.  Practical Magic had no objection to, or issue with, Defendant publishing a further book, and Defendant has at all times been aware of this fact.  This was the sole issue Defendant ever raised regarding her contractual obligations to the Series, and Defendant did nothing to resolve it.

78.    In all other respects, Defendant proceeded as if she assented to the terms of the On-Camera Talent Agreement, which was a prerequisite under her Attachment Agreement to proceeding with the production.   Specifically, Defendant began purporting to take direction and instruction from Practical Magic, appeared on set to perform on camera at the places and times prescribed by Practical Magic, and submitted all of her travel and lodging expenses to the production for reimbursement.  Most saliently, Defendant periodically drew down her salary in increments throughout the production, and at present, has been paid at least $45,000 of the $50,000 provided for in the On-Camera Talent Agreement.

79.    However, unbeknownst to Practical Magic, Defendant had intentionally, in bad faith, schemed to withhold her signature from the On-Camera Talent Agreement. While doing so, Defendant intended to lead, and in fact led, Practical Magic to rely on her apparent assent by proceeding with the production.

80.    Defendant did so because she believed it would give her a method by which to sabotage the production or otherwise wrestle full creative control over the Series should it ever become unfavorable toward her or her views.  Defendant has a significant financial interest in ensuring that the Series supports her views because she plans to release another book in the near future.  If the Series did not support Defendant's views, the sales of both Defendant's existing book and her future book(s) would be harmed, nor would Defendant be able to further monetize and exploit her research and theories surrounding prehistorical cave art.

81.    As such, Defendant concocted a scheme by which she would spring the "trap" of her missing signature if she ever felt the Series was diverging from her viewpoints.

82.    As a salient illustration of Defendant's character in this regard, at a creative retreat for the Series hosted by Practical Magic, several people heard Defendant gleefully brag to the team words to the effect of "I'm the queen of dodging everything so no one can pin me down."

83.    Additionally, a member of Practical Magic hired a nanny for Defendant to help care for her children during the production.  This nanny overheard Defendant speak extensively to the idea that she viewed herself as the sole owner of the grant and the money therein, expressed a desire to be in control of everything, and discussed influencing the production as if such were true.

84.    Defendant took affirmative steps to trick and deceive Practical Magic into believing that she had assented to her On-Camera Talent Agreement when she had not (and when she had no intention of doing so).  For example, Defendant clearly indicated to Practical Magic that she was in agreement with all of the terms of her employment,

1  and that she just wanted a separate document dealing with her book rights.  As an

2  Executive Producer, Defendant was responsible for uploading her own paperwork into

3  the system.

4      85.    Both Practical Magic and Defendant began performing pursuant to

5  Defendant's On-Camera Talent Agreement, and Defendant began drawing the salary

6  provided for her under her On-Camera Talent Agreement.

7  **H.    March 2022: The Parties Begin Pre-Production Based on a Mutual**

8      **Understanding that Defendant Has Assented to All Terms of Her**

9      **Relevant Agreements**

10     86.    Pre-production on The First Signs commenced promptly after the JTF

11  Grant Agreement had been finalized and lasted from March to August of 2022.

12     87.    Pursuant to Defendant's Attachment Agreement, "[n]o party hereto shall

13  have the right to proceed with the development, production, distribution and/or other

14  exploitation of the Series with a Third Party until all other parties have given their full

15  and complete approval to the terms of their respective agreements."  (Exhibit A, ¶ 2.)

16  Accordingly, if Practical Magic had known that Defendant never executed nor planned

17  to execute her On-Camera Talent Agreement or intended to take the position that the

18  Attachment Agreement had expired or was otherwise invalid, Practical Magic would

19  not have proceeded with the production.  Indeed, Practical Magic proceeded with

20  production because of, and in reliance on, Defendants' indications – by words and

21  conduct – that the terms of the On-Camera Talent Agreement had been agreed upon.

22     88.    On the understanding that Defendant had given her full and complete

23  approval to the terms of her employment agreements, Practical Magic commenced with

24  pre-production on The First Signs.

25     89.    In reliance on its understanding that Defendant had assented to proceeding

26  with the project, Practical Magic negotiated reduced salaries with all participants and

27  leveraged its relationships and reputation to obtain sponsors/contributors for the non-

28  profit project, such as Land Rover®, which lent the production vehicles.  During this

time, Practical Magic also passed on opportunities including other financially lucrative, for-profit projects that it would have accepted but for its engagement with The First Signs.

90.     At this time, Defendant began drawing against her $50,000 salary as set in the On-Camera Talent Agreement.   On October 3, 2021, Practical Magic had provided Defendant with a $3,000 advance, which was expressly understood by all parties to be an advance against Defendant's salary.   Then, starting in May of 2022, Defendant began routinely requesting payment in increments.   Defendant requested, and was paid, as follows: $10,000 (May 10, 2022); $10,000 (August 2, 2022); $7,000 (August 31, 2022); $5,000 (October 18, 2022); $5,000 (November 15, 2022); $5,000 (December 21, 2022).[7]   These payments were understood by all parties to be drawn against Defendant's provided-for salary.   In total (including the advance), at present, Defendant has been paid at least $45,000 of her $50,000 salary.

91.     There is no basis on which Defendant could have drawn her salary if she had not assented to the terms of her On-Camera Talent Agreement.   Accordingly, Defendant's drawing her salary led Practical Magic further to believe that she assented to the On-Camera Talent Agreement.

**I.     August 2022: Defendant's Misrepresentations Are Exposed, Severely Prejudicing the Production**

92.     One of Defendant's primary duties during pre-production, in her role as Project Leader, was to secure permits for, and schedule access to, various cave systems all over the world to serve as locations for shooting.   Defendant had at least three full months – after sites were discussed and/or agreed-upon but before shooting began – to accomplish these tasks.   Furthermore, Defendant had at her disposal a multitude of other people working on the production to whom she could have delegated procedural

---

[7] Practical Magic provided Defendant a $1,000 loan in February of 2023 so that she could pay her cell phone bill and remain contactable.  Practical Magic reserves the right to contend that this payment should be counted against the total salary owed to Defendant.

1   tasks.  Defendant never suggested that there were significant issues with the permit and
2   approval process, leaving it to Practical Magic to investigate and discover the severity
3   of such issues, and raise the alarm.

4        93.    Quite the opposite, Defendant repeatedly assured Practical Magic, as well
5   as other members of the production staff, that she was on top of all the paperwork
6   necessary to permit this access.

7        94.    For instance, Defendant stated in a May 15, 2022, Zoom conference that
8   she was actively working on securing a "blanket" permit for cave access in Spain.
9   Practical Magic would later learn that there was no such thing as a "blanket" permit.
10  Indeed, each cave site is closely guarded and regulated by local officials to protect and
11  preserve the prehistoric cave art.

12       95.    As another example, on June 17, 2022, the Director of the Museum of
13  Prehistory and Archaeology of Cantabria, Spain, e-mailed Defendant and expressed
14  enthusiasm about The First Signs, but cautioned Defendant that the process for
15  permitting access to Cantabria's cave systems was slow and bureaucratic.  Defendant
16  forwarded that e-mail to Practical Magic and assured them that she would "deal with
17  the paperwork side," as was her job.

18       96.    Defendant expressly told Practical Magic, for months, that she was to
19  perform and broadly oversee the process of applying for or securing site permits
20  because she was the one who had to manage such things, both in her capacity as a
21  "researcher" and via her personal relationships at the sites in question.  Practical Magic
22  relied on these representations, to its detriment, because it had believed Defendant's
23  misrepresentations, including Defendant's representations to be familiar with
24  television production and her appearance as a competent diligent professional.

25       97.    However, in August of 2022 – mere weeks before departing for Europe to
26  begin principal photography in Italy, France, and Spain – Practical Magic discovered
27  that Defendant had failed even to **start the application process** for **the vast majority of**
28  **planned filming locations**.  Practical Magic learned this information from other

1    researchers in the cast, not Defendant, who had grown suspicious of Defendant and

2    began checking the status of the production's location permit applications (and finding

3    out they did not exist).  Suddenly, the production crew found themselves with virtually

4    no access to any of the cave sites where they planned to film, and precious little time

5    to fix the problem.

6          98.    The application and approval process to bring a film crew to an

7    anthropologically significant site in most countries can take months or longer.  Hence,

8    it was mission critical for Defendant, as the Project Leader, to secure access to these

9    cave systems.  Access to these cave systems – and the art therein – was the core premise

10   of the project.  Yet, without telling anybody, in almost all cases, Defendant simply did

11   not do so.  For instance, despite providing assurances that she would, Defendant never

12   initiated the lengthy process laid out for her to permit access to caves in Cantabria.  The

13   only reason the Series was ultimately able to film anywhere in Cantabria was due to

14   the herculean effort of the rest of the production staff to pick up Defendant's slack.

15         99.    All told, Defendant was responsible for securing permits and access to at

16   least the following sites, but failed in one way or another to do so:

17              a.    France: Grotte de Font-de-Gaume; Niaux; Les Combarelles; Les

18   Eyzies Museum (MNP); Cougnac Cave; Pech Merle; Grotte des Combarelles; Le

19   Poisson; Pair-non-Pair; Rouffignac; Bernifal; Gabillou; Toulouse City; Mas d'Azil (the

20   end of things); Bédeilhac; Gargas; University of Toulouse; and Les Trois-Freres.

21              b.    Spain: Covaron; El Castillo; Covalanas; Cullalvera; Tito Bustillo

22   Las Monedas; Cueva de El Arco A, B, & C (formerly referred to as Los Arcos); Pondra;

23   La Lloseta; Cueva del Tenis (formerly referred to as La Tenis); Lekeitio 1, 2, & 3;

24   Tebellín; Altamira; Sotarizza; Cova Negra; La Garma; Salitre; Aitzbitarte IV; Ekain;

25   Alkerdi 1 and 2; Altxerri; La Riera; Balmori; Las Herrerias; Las Mazaculos; La Pasiega

26   A, B, C, D; and Las Chimeneas.

27              c.    Bulgaria: Bacho Kiro.

28

The production was never able to film at most of these locations.  Varying levels of access to some of these locations was subsequently arranged through last-ditch efforts of the production, allowing limited production to occur.

100.   It quickly became clear that Defendant had lied about herself, her credentials, her influence, her abilities and experience, and her level of access to the world's cave systems.  Indeed, it turned out that many of the sites' permit processes required a researcher with a Ph.D. employed by a university to sign off on the application – which Defendant, having been dismissed or otherwise separated from her Ph.D. program, was not.  But Defendant, perhaps embarrassed about her failures, never raised this issue.  There were other researchers on the cast or otherwise involved with the production, who did have Ph.D. degrees and were employed by universities, and Defendant ultimately relied upon their help to overcome her failures when circumstances had become dire.  Instead of acting in a timely manner, she allowed months to pass, never giving any indication that she was unable to fulfill her duties.

101.   Separately, Practical Magic and Folklight asked Defendant for months for basic information about each cave site, around which the entire Series was based – for example, which symbols were in which caves, what the terrain was like at each site, and what logistics would be required for shooting in the caves, etc.  It took an absurd amount of time for Defendant even to begin circulating this basic information. Defendant had been appointed Project Leader on the premise that she would be diligent in her duties, but in fact, Defendant treated the Series neglectfully.

102.   Fortunately, Practical Magic was able to salvage the production, but not without significant burden and expense.  Practical Magic, along with Folklight, as well as several other researchers and members of the cast and crew, banded together in these final weeks before shooting to pick up Defendant's slack.  They scrambled to secure access to at least some significant cave systems, so as not to leave the production dead in the water.

103.   Folklight, the project's fiscal sponsor, had to jump in on the permit process, taking them away from gathering financial support for the project, which was critical to completing the production based on the limited funding secured through the John Templeton Foundation grant.   Because of Defendant's misrepresentations, Practical Magic was unable to properly leverage the non-profit aspect of the Series.

104.   Ultimately, the entire production schedule had to be re-done, and the start of production had to be moved from Europe to the United Kingdom, resulting in a costly and time-consuming effort to re-organize travel and lodging for the cast and crew.  Moreover, Practical Magic had to establish operations and logistics in the United Kingdom, where they had not previously planned on having a full-fledged production, resulting in even more needless expense.  All of this was at significant cost and burden to Practical Magic – cost and burden Practical Magic never anticipated when it agreed to participate in a non-profit venture for no production fee.

105.   Nevertheless, by the sheer force of will of Practical Magic, Folklight, and other members of the production, a sufficient number of sites were secured to continue with production of the Series.

106.   Meanwhile, Defendant took a two-week vacation in the very final two weeks before the commencement of on-location shooting for purposes of visiting her paramour.  She went to a location with virtually no cell coverage or WiFi, so she rendered herself unable to work as required during those critical two weeks.

**J.     September 2022: Defendant's On-Set Behavior Further Prejudices the Production**

107.   The total cast and crew of the production consisted of around 45 people for varying lengths of time, the exact amount of people fluctuating depending upon timely needs.  Some members of the cast were scientists/experts in the field of cave art selected by Defendant herself.  Given the non-profit nature of the project, it was extremely important to ground the project in accepted scientific theory.  Indeed, it was a stipulation in both the JTF Grant Agreement and the Folklight Fiscal Sponsorship

1  Agreement that the project be educational, scientific, and factual, consistent with its
2  non-profit nature.  (Exhibit B, ¶ 7(b); Exhibit C, p. 5, ¶ 4.3(d); *see also id.*, p. 19, ¶ 2.)
3  Accordingly, the talent included numerous highly respected scientists and researchers
4  in anthropology and similar fields, and the production relied on these people for
5  research and to craft the narrative of the docuseries.

6       108.   Almost immediately upon the commencement of principal photography,
7  a rift grew between Defendant, on the one hand, and the rest of the scientific experts,
8  on the other hand.  The scientific consensus of every person with relevant scholarly
9  credentials – besides (if she counts) Defendant – simply did not support the views and
10 overarching theories that Defendant had expressed in her TED Talks and book.
11 Defendant grew concerned, and then agitated, by her colleagues' reticence to lend
12 support to her theories.

13      109.   Defendant would frequently get into verbal altercations with, and act
14 dismissively toward, the other researchers, creating a toxic working environment when
15 left unchecked.  Many of these encounters are recorded on video and/or audio.

16      110.   Defendant became difficult to work with, and continually attempted to
17 overrule the decisions made by Practical Magic, the production's Science Advisory
18 Board, and other members of the production, wreaking havoc on the production.  It was
19 very common for there to be a limit on the number of people who could be in a cave at
20 any time, and when crew members had to be sent in alone with Defendant, she would
21 give instructions and direction contrary to what Practical Magic had directed.  For
22 example, the Director of Photography had to ask Practical Magic for "protection" from
23 Defendant because she was constantly giving instructions that contravened Practical
24 Magic's instructions.

25      111.   Defendant also frequently refused to give cast and crew members required
26 breaks, requiring other members of production staff to intervene and require her to
27 allow these breaks.  As an Executive Producer, and as someone who represented having
28 experience in television production, Defendant should have known and understood her

1  responsibility to the health, safety, and welfare of the cast and crew.  Because

2  Defendant did not, Practical Magic and others were required to devote time and

3  resources to correcting Defendant's errors or otherwise ensuring the production

4  proceeded safely and according to all applicable regulations.

5      112.  Defendant also engaged in sexually based misconduct directed toward

6  other members of the production staff.  Specifically, Defendant repeatedly summoned

7  a set medic she was observed to be fond of to her hotel room to give her private

8  massages.  On one occasion, Defendant summoned this same set medic to her hotel

9  room under the guise of "removing a tick."  As the set medic arrived, Defendant's

10  mother was walking out of Defendant's hotel room, and Defendant's mother muttered

11  words to the effect of, "I don't want to be a part of this."  Defendant answered the door

12  for the medic wearing a robe, which she then opened to expose a bra and revealing

13  underwear.  Defendant stated that the tick was somewhere on her inner thigh, requiring

14  the medic to move his face close to her genitals.  Defendant indicated that the "tick"

15  was in an area one to two inches from her genitals.  Upon inspection, the medic

16  determined that what Defendant was pointing to was unmistakably some kind of mole

17  or skin tag, as Defendant knew.  The medic readily surmised that Defendant was

18  making a sexual advance on him, declined, and left Defendant's hotel room.

19      113.  On a separate occasion, Defendant showed a different, male member of

20  the production staff an inappropriate photograph of herself on her own phone.

21      114.  Defendant was also caught making misleading statements to production

22  staff and to local government authorities overseeing cave visits.  For instance, on more

23  than one occasion, while the crew was in the middle of filming, an angry authority

24  would storm up to the crew and complain that the government had been misled about

25  the number of people who would be physically on site.  These misrepresentations were

26  traced back to Defendant.

27      115.  Defendant was also caught making false statements to other talent.  For

28  instance, on one occasion, Practical Magic noted significant discrepancies between

Defendant's recitation of her recollection of an encounter with a cave guardian and the recollections of other witnesses who were present.

116.  To its credit, Practical Magic took steps to rectify Defendant's purposeful and damaging misconduct.  On the evening of September 13, 2022, a representative of Practical Magic took Defendant aside into a conference room at the Moxy Bristol hotel in the United Kingdom.  He read to Defendant a written statement in the form of a human resources complaint, providing her with detailed feedback about her behavior and the problems leading up to production, including her failure to perform her duties and the effect this had and continued to have on the cast, crew, and production in general.  Specifically, this statement called out Defendant's misguided belief that her colleagues on the project had conspired to plot against her; misguided belief that everyone on the project wanted her to fail; laissez faire approach to work, and deflection of responsibility.  The statement concluded by encouraging Defendant to step up to the plate in her executive role and to apologize to the production staff who she had wronged.

117.  Following this event, on the same evening at the same location, Defendant was asked to apologize to Matt Lewis and Brooke Tansley, or to have a discussion about exiting the production.  Defendant elected to apologize to Lewis and Tansley. However, Defendant's behavior did not subsequently improve.  Defendant grew more and more agitated that her scientific colleagues (and, by extension, the docuseries as a whole) were not willing to support her speculative theories, at which point she behaved as if the world was out to get her.  This caused her behavior to become more and more erratic.

118.  Nevertheless, setting aside the quality of Defendant's performance, during this entire time, Defendant continued to perform under her On-Camera Talent Agreement – including by purporting to take direction/instruction from Practical Magic; by complying with all scheduled call times and appearing on set when needed; and by drawing down her salary.  (*See supra*, ¶¶ 69-74.)  At no point did Defendant

attempt to negotiate any terms of the On-Camera Talent Agreement, nor did any of her representatives timely contact Practical Magic.  At no point did Defendant ever contend that there was an issue with proceeding with production.   Had Defendant done so, Practical Magic would have immediately taken steps to rectify the issue, including temporarily shuttering the production, if necessary.

119.   Specifically, Defendant appeared on set and performed on camera on at least the following dates (all in year 2022):  September 7, 9-10, 13, 15-17, and 20-24; October 3-5, 7, 9, 15-17, 21-24, and 26-30; and November 2, 4-5, 8, and 13-17. Defendant also submitted all of her travel and lodging expenses to the production for reimbursement during this period (as was provided for in her On-Camera Talent Agreement).

**K.**     **September 2022 – March 2023: Defendant Uses the Fact that She Never Signed Her On-Camera Talent Agreement to Derail the Production and Attempt to Wrestle Control Away from Practical Magic and Folklight**

120.   At the apex of Defendant's extreme behavioral problems, she sprung her perceived trap by suddenly becoming supposedly concerned with getting her On-Camera Talent Agreement signed.

121.   On September 19, 2022, while the production crew, including Defendant, was in Europe for location shooting, Defendant – for the first time – mentioned that she never signed the On-Camera Talent Agreement via a text message sent to the Executive Producer.  In this text message, Defendant acknowledged that she had signed the Attachment Agreement, stating "the only thing I ever signed was a boiler plate initial attachment agreement with Angel Media," and acknowledged "[t]here is mention of a later step 2 including EP etc . . . but that never happened as it didn't follow the typical development path."  The Producer responded that he would investigate, but that "the original agreement is nothing to worry about" because "w[e] can basically

just add an on camera agreement, and **we all know the budget, pay, and rules from JTF, so no surprises there**."  Defendant replied: "OK perfect- thank you!"

122.   It is no coincidence at all that Defendant raised this issue mere **days** after being strongly reprimanded for her behavior.  It would soon become clear that Defendant intended to activate her strategy of using her own withholding of her signature from the On-Camera Talent Agreement to either take control of, or tank, the production.

123.   Defendant told Amy Bloom, co-owner of Practical Magic, that Defendant was missing paperwork, even though all cast members were given a copy of their paperwork on set near the first day of shooting, or otherwise as required throughout production, and further that she had six months up until that point to complete paperwork required of her, the progress of which was tracked in Monday.com.  Then, Defendant shifted to claiming that she was working with her attorney and agent towards some kind of paperwork (which Practical Magic believed pertained to her book rights, not the On-Camera Talent Agreement), but Practical Magic would never hear from either of these individuals.

124.   On information and belief, Defendant never negotiated with Folklight or the John Templeton Foundation over the On-Camera Talent Agreement either.

125.   Having already been paid at least $45,000, in January of 2023, Defendant requested to be paid the last $5,000 of the $50,000 allotted for her in the budget via text message to Amy Bloom.  Practical Magic notified Defendant that it would be the final payment.  Demonstrating Defendant's extreme bad faith, she suddenly took the position that she believed all the money she had been paid up to that point was **separate** from the $50,000 allotted for her salary in the budget.  She did not explain where she thought the money was coming from, if not out of her salary.  The only source of money was the grant.  There is no reasonable interpretation of any agreement, statement, or conduct by Practical Magic that could have led Defendant honestly to believe that her payments up to that point were separate from her salary.

126.   On information and belief, Defendant told the John Templeton Foundation in or around March or April of 2023 that Defendant had not yet completed all the necessary paperwork related to The First Signs.  On information and belief, she did so with the intention and for the purpose of prejudicing the production by causing the John Templeton Foundation to withhold funding.  On April 21, 2023, in an e-mail to Practical Magic and Folklight, the John Templeton Foundation stated that it would not be making any further distributions of the grant funding until the long-form agreement referenced in Defendant's Attachment Agreement, *i.e.*, her On-Camera Talent Agreement, was executed.  At this point, $1,438,471 had not – and still has not – been distributed by the John Templeton Foundation.

127.   The John Templeton Foundation stated that this On-Camera Talent Agreement was a precondition of further funding because the John Templeton Foundation believed it gave Practical Magic the right to use Defendant's image in connection with The First Signs.  The John Templeton Foundation was mistaken.  As Practical Magic explained in a reply e-mail, Defendant already granted Practical Magic the rights to The First Signs, and to use her image in connection therewith, in the Attachment Agreement.  That Attachment Agreement was locked in when Practical Magic secured the Science Channel Development Deal, and continued to apply when the project was transitioned to non-profit with the John Templeton Foundation's grant funding.   However,  notwithstanding  Practical  Magic's  explanation,  the  John Templeton Foundation continued to insist that the On-Camera Talent Agreement be executed before the John Templeton Foundation would distribute further funding.

128.   On information and belief, Defendant intentionally raised her lack of signature on the On-Camera Talent Agreement with the John Templeton Foundation for the purpose of causing the John Templeton Foundation to withhold further funding and/or kill the project.  On information and belief, Defendant had developed a belief that the docuseries would not portray her and her research in favorable light, or perhaps could portray her in negative light – which Practical Magic never intended to do.  Her

38

COMPLAINT

motives for doing so are clear: Defendant grew (and remains) concerned that Defendant's career and financial livelihood, including the publication of her second book, would be harmed by the Series.  Indeed, Defendant initially gained notoriety based on her efforts to portray herself as a serious researcher, with credentials and access.  If the docuseries exposed those statements as untrue or in doubt, it would seriously damage her professional career.  For these reasons, Defendant employed her scheme to use the unsigned On-Camera Talent Agreement – which she knew was material to the John Templeton Foundation and grant funding – to derail, and if her plan succeeds, ultimately kill the project so it does not see the light of day.  (*See supra*, ¶ 82 ("I'm the queen of dodging everything so no one can pin me down.").)

129.   Defendant's strategy – devious though it may be – has thrown the Series into disarray.  The First Signs is a non-profit project, dependent entirely on the John Templeton Foundation's grant funding.  The John Templeton Foundation is a non-profit institution that promotes scientific research and exploration, and that wants to avoid any legal or reputational risk.  Defendant's refusal (in the John Templeton Foundation's eyes) to grant Practical Magic the right to use Defendant's appearance in connection with The First Signs would plainly frustrate the premise on which the John Templeton Foundation's grant funding was based.

130.   In an effort to rescue the production at this final hour, Practical Magic attempted to secure Defendant's signature on the On-Camera Talent Agreement.

**L.    April/May 2023: Defendant Refuses to Negotiate Her On-Camera Talent Agreement in Good Faith, in Breach of Her Attachment Agreement**

131.   On April 21, 2023, Practical Magic, through an executive, contacted Defendant about the "urgent" need for an executed version of the On-Camera Talent Agreement.   Practical Magic noted that the document was already provided to Defendant and Defendant may have simply failed to return it.  Practical Magic further notified Defendant that the John Templeton Foundation had asked Practical Magic "to withhold payments and further commitments to everyone (talent, crew, etc) until [the

1  John Templeton Foundation] receives" the signed On-Camera Talent Agreement.
2  Several hours later, Practical Magic sent an unsigned version of the document to
3  Defendant, and noted "the entire cast had to sign their own version of these, I don't
4  know why we don't have yours."  The executive also explained that the "[s]ooner this
5  gets back to JTF, [the] sooner they'll let us resume work/payments to cast/crew. . . ."
6  Further, Defendant was informed her outstanding agreement was the only document
7  "holding up payments" from the John Templeton Foundation.

8      132.   Defendant responded the next day claiming she had "never seen this
9  document before (the only thing [Defendant] signed was the 2020 holding agreement)."
10  Defendant advised Practical Magic that she contacted her attorney about the document.

11      133.   Practical Magic responded the same day, "Excellent! Absolutely have the
12  lawyer look at it and know it's a boilerplate doc for all talent we use with Discovery,
13  and the other cast have all signed already as did my own team that appears on camera,
14  and I'll have to sign it too if I appear.  It is actually mentioned directly in your
15  [Attachment] Agreement, that you'd need to do this. It is common to factual TV,
16  distributors require it."

17      134.   Five days later, on April 27, 2023, Defendant's counsel, Gregory Boyd,
18  responded to Practical Magic.  Mr. Boyd explained that "it has taken some time to
19  review and coordinate everything on our end."  According to Mr. Boyd, "there is no
20  actual production agreement with [Defendant] and Practical Magic."  As a result, the
21  parties needed to "set out the services [Practical Magic] will be providing to
22  [Defendant]," "make sure you have an IP license to her materials so that you are able
23  to make the show," and "Compensation and credits need to be set out."  Mr. Boyd then
24  introduced Mr. Lewis to another attorney for [Defendant], who would purportedly
25  prepare a "production agreement and related documents."  Finally, Mr. Boyd claimed
26  that the John Templeton Foundation was not placing time pressure on the parties to
27  complete the On-Camera Talent Agreement.

28

135.    Mr. Boyd's observations, however, were contrary to the express terms of the Attachment Agreement.  First, no production agreement was necessary.  Under the Attachment Agreement, Practical Magic "shall have full and complete approval over the services to be rendered by [Practical Magic] and the terms of the agreement for such services."  (Exhibit A, ¶ 2.)  Second, the Attachment Agreement resolved the parties' respective intellectual property rights.  "[Practical Magic] shall own the results and proceeds of such services (and the exclusive right to use intellectual property owned or controlled by [Defendant] utilized in conjunction with the Series . . . with the sole right to exploit same in all media throughout the world in perpetuity."  (*Id.*) Compensation and credits were terms of the On-Camera Talent Agreement – the document at issue.

136.    Practical Magic corrected Mr. Boyd in a responsive email the same day: "The urgency is due to a stop work order issued by JTF, and the ripple effect of same. We have very little time to get the basic On Camera Talent [A]greement executed in good faith, as doing so is required in the already-executed Attachment Agreement that already handled the IP and related rights."  Mr. Boyd confirmed that he possessed the Attachment Agreement, but took the position that the On Camera Talent Agreement would only be executed "in parallel with other documentation" – a position that runs contrary to the express terms of the Attachment Agreement.

137.    On April 28, 2023, Practical Magic's counsel spoke to another attorney for Defendant, Scott Goldman.[8]  During the call, Mr. Goldman advised Practical Magic's counsel that he intended to speak with Defendant the following day, and would respond to Practical Magic's counsel early the following week.  No such follow-up communication from Mr. Goldman occurred.  On May 9, 2023, Practical Magic's

---

[8] Defendant is also represented by Jeremy S. Goldman.  Jeremy S. Goldman, Scott Goldman, and Mr. Boyd are all members of the same law firm.  References to "Mr. Goldman" refer to Scott Goldman.

COMPLAINT

counsel wrote and telephoned Mr. Goldman and expressed the urgency in reaching a resolution on the On-Camera Talent Agreement.

138.  On May 16, 2023, Defendant's bad faith motives started to become clear. Defendant's counsel demanded all "existing footage of the program" and a "cost report as to what has been spent" – both of which Defendant had no entitlement to under the Attachment Agreement.  In response, Practical Magic's counsel demanded that Defendant sign and return the On-Camera Talent Agreement "(which [Practical Magic] had every reasonable expectation to believe had already signed and returned based on its and your client's conduct, *e.g.*, [Defendant] performed and was paid pursuant to its terms, and my client reasonably relied thereon in producing, funding, paying, etc.)." Nevertheless, Practical Magic offered to make the footage available for Defendant's review after the On-Camera Talent Agreement was executed and explained that cost reports were delivered to the John Templeton Foundation in accordance with the grant conditions.  Practical Magic' counsel also proposed a conference call to further discuss the dispute.

139.  The response from Defendant's counsel was demonstrably false and misleading.  For example, Defendant's counsel wrote, "[Defendant] brought [Practical Magic] on board to render production services and to deliver the series."  Defendant's counsel also claimed Defendant "was instrumental in arranging the critical elements of the production, including without limitation selecting cave art sites that were shot . . . using her vast professional connections."  Neither assertion could be further from the truth, as alleged above.  Defendant's counsel also claimed Practical Magic had not shown sufficient "respect for [Defendant's] role in this series," laying bare Defendant's intention to renegotiate compensation, credit, and control terms that had long been settled.  Similarly, Defendant's counsel claimed the On Camera Talent Agreement, with a compensation figure based on the budget allotted by the John Templeton Foundation, "proposes compensation significantly below what is fair for her services." Of course, given the non-profit nature of the venture, Practical Magic, other cast

1  members, and crew are also receiving compensation far below fair market value as
2  well.

3      140.   Because Defendant refused to enter into good faith negotiations over the
4  limited agreement at issue but instead sought to reopen negotiations on the entire
5  project, on May 18, 2023, counsel for Practical Magic sent a demand letter to
6  Defendant's counsel.  This letter informed Defendant that she was in breach of the
7  provision in her Attachment Agreement requiring her to negotiate in good faith, taking
8  into account prevailing industry standards.  The letter explained that Defendant had
9  already drawn her salary and executed the services described in Defendant's On-
10 Camera Talent Agreement.  It further explained that Defendant was always aware of
11 the terms of the On-Camera Talent Agreement, and performed pursuant to the On-
12 Camera Talent Agreement, but was unreasonably withholding her approval and thereby
13 frustrating the production of The First Signs.  The letter demanded that Defendant
14 comply with her obligation under the Attachment Agreement by executing and
15 returning the On-Camera Talent Agreement to Practical Magic.

16     141.  On May 19, 2023, Practical Magic's counsel called Mr. Goldman.
17 Practical Magic' counsel implored Mr. Goldman to join a video or telephone
18 conference with the John Templeton Foundation in order to resolve the impasse.  In
19 response, Mr. Goldman again demanded raw footage and cost reports, which he
20 confirmed was a pre-condition to any negotiations on the On Camera Talent
21 Agreement.  When Practical Magic's counsel refused, Mr. Goldman claimed he would
22 respond to Practical Magic's demand letter and promptly hung up the telephone.  In an
23 email message several hours later, Mr. Goldman again reiterated the same unreasonable
24 preconditions to any negotiation required by the Attachment Agreement.

25     142.  Correspondence continued along the same lines on May 22, 2023.
26 Practical Magic's counsel both implored Defendant and her counsel to participate in a
27 meaningful dialogue to resolve the dispute ahead of the May 29, 2023, 12:00 p.m.
28 deadline set by the John Templeton Foundation.  In a May 22, 2023, email, Practical

1   Magic's counsel asked Mr. Goldman, "Why are you making no attempt to resolve this
2   by the noon tomorrow deadline?"  It had become abundantly clear that Defendant had
3   no intention to performing her obligations under the Attachment Agreement but instead
4   intended to renegotiate the entire production (to ensure it would be favorable to her) or
5   kill it because she lacked creative control – both of which constitute impermissible,
6   fraudulent, and bad-faith conduct.

7       **M.      May 2023: The John Templeton Foundation Issues a Deadline by**
8              **Which the On-Camera Talent Agreement Must Be Signed, Or It Will**
9              **Withdraw Its Grant Funding**

10      143.   In light of Defendant's refusal to sign her On-Camera Talent Agreement,
11  the John Templeton Foundation issued a deadline by which, if Defendant had not
12  signed her On-Camera Talent Agreement, the John Templeton Foundation would pull
13  its funding for the Series – initially May 29, 2023.

14      144.   Defendant's execution of the On-Camera Talent Agreement is material to
15  the John Templeton Foundation because the John Templeton Foundation believes that
16  Practical Magic would otherwise lack the image rights to use Defendant in the Series.

17      145.   The John Templeton Foundation later extended the deadline to June 2,
18  2023.

19      146.   Notwithstanding the John Templeton Foundation's June 2, 2023,
20  deadline, counsel for Practical Magic has been informed by counsel for Defendant that
21  Defendant does not intend to execute the On-Camera Talent Agreement and does not
22  intend to complete the project with Practical Magic.

23                          **FIRST CAUSE OF ACTION**
24                              **Breach Of Contract**

25      147.   Practical Magic repeats, realleges, and incorporates by reference all
26  preceding allegations of this Complaint for all purposes as though fully set forth herein.

27      148.   The Attachment Agreement constitutes a valid, written contract.  (*See*
28  Exhibit A.)

149.   Practical Magic and Angel Valley have either fully performed their obligations under the Attachment Agreement or are excused from performance under the Attachment Agreement.

150.   All conditions precedent to Defendant's performance under the Attachment Agreement have been satisfied or excused.

151.   Defendant breached the Attachment Agreement at least in the following ways: (i) by failing to take or adhere to Practical Magic's directions and instructions in connection with the Series; (ii) by failing to negotiate and execute the On-Camera Talent Agreement in good faith; (iii) by failing to act reasonably and in good faith in connection with The First Signs; (iv) by unreasonably withholding her approval so as to frustrate the development, production, distribution, and other exploitation of the Series; (v) by failing to execute such further documents as Practical Magic deemed necessary and desirable to carry out the purposes of the Attachment Agreement; and (vi) by taking the position that that Attachment Agreement is expired or otherwise invalid, constituting an anticipatory repudiation/breach.

152.   As a direct and proximate result of Defendant's breaches, Practical Magic has been damaged in an amount to be proven at trial, plus interest.

153.   Furthermore, Practical Magic is entitled to specific performance of the Attachment Agreement.

## SECOND CAUSE OF ACTION

### Breach of Implied Covenant of Good Faith & Fair Dealing

154.   Practical Magic repeats, realleges, and incorporates by reference all preceding allegations of this Complaint for all purposes as though fully set forth herein.

155.   The Attachment Agreement constitutes a valid, written contract.  (*See* Exhibit A.)

156.   Practical Magic and Angel Valley have either fully performed their obligations under the Attachment Agreement or are excused from performance under the Attachment Agreement.

COMPLAINT

157.   Implied in the Attachment Agreement is a covenant of good faith and fair dealing by which Defendant agreed to take no action to interfere with the rights of Practical Magic to obtain the benefits of the Attachment Agreement.

158.   Defendant has interfered with Practical Magic's right to obtain the benefits of the Attachment Agreement by attempting to take control of the Series away from Practical Magic and/or tank the production of the Series.  Defendant has also interfered with Practical Magic's right to obtain the benefits of the Attachment Agreement by taking the position, in bad faith, that the Attachment Agreement had expired or was otherwise invalid.

159.   As a direct and proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Practical Magic has been damaged in an amount to be proven at trial, plus interest.

### THIRD CAUSE OF ACTION

### Declaratory Judgment

160.   Practical Magic repeats, realleges, and incorporates by reference all preceding allegations of this Complaint for all purposes as though fully set forth herein.

161.   Defendant executed the Attachment Agreement, requiring her to negotiate and execute in good faith an On-Camera Talent Agreement.

162.   Practical Magic provided Defendant with such an On-Camera Talent Agreement, and Defendant indicated that she assented to it.  Defendant did not indicate that she disagreed with or wanted to negotiate any of the terms of her On-Camera Talent Agreement.  Instead, Defendant proceeded with the production of the Series.

163.   Defendant's statements and conduct created an implied-in-fact contract on the terms expressed in Defendant's On-Camera Talent Agreement and/or created implied-in-fact assent to the terms of her On-Camera Talent Agreement.

164.   Defendant has taken the position that the terms of the On-Camera Talent Agreement are not binding because she never signed it.

165.   A genuine controversy exists regarding whether Defendant's conduct created an implied-in-fact contract on the terms expressed in Defendant's On-Camera Talent Agreement and/or created implied-in-fact assent to the terms of her On-Camera Talent Agreement.

166.   Accordingly, Practical Magic seeks a declaration pursuant to the Declaratory Judgment Act that Defendant's conduct created an implied-in-fact contract on the terms expressed in Defendant's On-Camera Talent Agreement and/or created implied-in-fact assent to the terms of her On-Camera Talent Agreement.

## FOURTH CAUSE OF ACTION

### Promissory Estoppel

167.   Practical Magic repeats, realleges, and incorporates by reference all preceding allegations of this Complaint for all purposes as though fully set forth herein.

168.   Defendant made numerous promises to Practical Magic, or otherwise indicated that she agreed to terms, including but not limited to (i) that Practical Magic would have the rights to produce and distribute the Series; (ii) that Practical Magic would have the right to control and direct Defendant's performance in connection with the Series; (iii) that Defendant granted Practical Magic the rights to use her image in connection with the Series; and (iv) that Defendant's total salary in connection with the Series would be $30,000 plus a $20,000 completion bonus.

169.   Practical Magic in fact relied on these promises or indications of assent by proceeding with the production of the Series nearly to completion.  Practical Magic also in fact relied on these promises or indications of assent by paying Defendant her entire salary and almost her entire completion bonus.

170.   Practical Magic's reliance on these promises or indications of assent was reasonable because Defendant gave every appearance that she intended to follow through on these promises, including but not limited to, by appearing and performing on camera, and by requesting and accepting payment of her salary.

COMPLAINT

171.   Practical Magic materially changed its position in reliance on Defendant's promises or indications of assent by agreeing to work with Defendant, agreeing to proceed with the project on a non-profit basis, agreeing to proceed with Defendant as Project Leader, agreeing to waive its producer's fee, agreeing to have its employees work for reduced rates, and agreeing to forfeit the right to exploit the Series for profit.

172.   Because Practical Magic materially changed its position in reliance on Defendant's promises or indications of assent, Defendant is estopped from asserting that the promises or indications of assent she made to Practical Magic are invalid or otherwise unenforceable pursuant to the doctrine of promissory estoppel.

## FIFTH CAUSE OF ACTION

### Fraudulent Inducement

173.   Practical Magic repeats, realleges, and incorporates by reference all preceding allegations of this Complaint for all purposes as though fully set forth herein.

174.   As fully set forth above, Defendant made various representations to Practical Magic designed to induce Practical Magic into entering into the Attachment Agreement with Defendant, remaining in the Attachment Agreement with Defendant, deciding to and continuing to work with Defendant, and keeping Defendant on as the Project Leader.  For example, and among other things, Defendant represented (i) that she would soon be completing her Ph.D. degree; (ii) that she would be able to get the production access to important cave sites; (iii) that she had relationships with key individuals she could leverage for the benefit of the production; and (iv) that she had experience producing television and was familiar with the process.

175.   These representations made by Defendant to Practical Magic were false. On information and belief, Defendant was dismissed or otherwise separated from her Ph.D. program without receiving her degree, but did not timely disclose this fact to Practical Magic.  Defendant was not able to get the production access to the majority of important cave sites that she represented she would.   The majority of the relationships Defendant had represented she had either did not exist or were not

1  amicable.   Defendant admitted that she in fact had little experience producing
2  television.

3       176.   Practical Magic relied on the representations of Defendant by, among
4  other things, agreeing to work with Defendant, entering into the Attachment
5  Agreement, agreeing to proceed with the Series on a non-profit basis, agreeing to
6  proceed with Defendant as Project Leader; and foregoing other opportunities that
7  would have financially benefitted Practical Magic.

8       177.   Practical Magic's reliance on Defendant's representations was reasonable.
9  Defendant presented herself as a qualified researcher and Ph.D. candidate, and
10 Practical Magic had no reason to believe otherwise.  Additionally, Defendant was made
11 to appear more legitimate to Practical Magic by the apparent positive reception of her
12 TED Talks and book.  Further still, Defendant went to great lengths to make herself
13 seem respected and influential throughout the world, including by extensively name-
14 dropping authorities in the field of cave art, many of which individuals later disagreed
15 with the characterization of their relationship with Defendant or even expressed dislike
16 toward her.

17       178.   As a direct and proximate result of Defendant's fraudulent statements and
18 conduct, Practical Magic has been damaged in an amount to be proven at trial.

19       179.   Additionally, Defendant's actions in making fraudulent representations to
20 Practical Magic were intentional, malicious, and despicable, such that Practical Magic
21 is entitled to an award of punitive and/or exemplary damages against Defendant.

22                    **SIXTH CAUSE OF ACTION**
23                **Fraud – Intentional Misrepresentation**

24       180.   Practical Magic repeats, realleges, and incorporates by reference all
25 preceding allegations of this Complaint for all purposes as though fully set forth herein.

26       181.   As fully set forth above, even after the execution of the Attachment
27 Agreement, Defendant continued to make representations to Practical Magic, including
28 some of the same representations, designed to keep Practical Magic working with

49
COMPLAINT

Defendant, or that Defendant otherwise intended for Practical Magic to rely on.  For example, Defendant (i) continued to represent that she was in the process of completing her Ph.D. degree; (ii) continued to represent that she would be able to get the production access to important cave sites; (iii) represented that she had already secured access to important cave sites; (iv) represented that she was in the process of securing access to important cave sites; and (v) represented that she was in the process of leveraging the relationships she had promised to deliver.

182.   These representations made by Defendant to Practical Magic were false.  On information and belief, Defendant was dismissed or otherwise separated from her Ph.D. program without receiving her degree, but did not timely disclose this fact to Practical Magic.  Defendant was not able to get the production access to the majority of important cave sites that she represented she would.  As to the majority of cave sites to which Defendant represented that she had already secured access, Defendant had not already secured access.  As to the majority of cave sites to which Defendant represented she was in the process of securing access, Defendant was not in the process of securing access.  As to the majority of relationships that Defendant had promised she could leverage to benefit the production, Defendant never delivered on the relationship.

183.   On information and belief, Defendant knew that her representations were false when she made them, and made the representations recklessly without regard for their truth.

184.   Practical Magic relied on the representations of Defendant by, among other things, continuing to work with Defendant, agreeing to proceed with the Series on a non-profit basis, agreeing to proceed with Defendant as Project Leader; not working on permit applications because Defendant represented that she was handling them.  Defendant intended for Practical Magic to rely on her representations by continuing to employ her and not working on the permit process itself.

185.   Practical Magic's reliance on Defendant's representations was reasonable.  Defendant presented herself as a qualified researcher and Ph.D. candidate, and

Practical Magic had no reason to believe otherwise.  Defendant told Practical Magic that she had been involved with the production of documentary television series in the past and was familiar with the process, bringing Practical Magic comfort that Defendant would be a competent Project Leader.  Defendant gave every appearance of being hard at work throughout the period during which she was supposed to be securing permits to access cave sites, including by sending numerous e-mails and chat messages stating she was hard at work, and gave Practical Magic no reason to believe she was failing to carry out her duties.

186.   As a direct and proximate result of Defendant's fraudulent statements and conduct, Practical Magic has been damaged in an amount to be proven at trial.  Defendant's representations were a substantial factor in causing Practical Magic's harm.

187.   Additionally, Defendant's actions in making fraudulent representations to Practical Magic were intentional, malicious, and despicable, such that Practical Magic is entitled to an award of punitive and/or exemplary damages against Defendant.

## SEVENTH CAUSE OF ACTION

### Fraud – Concealment

188.   Practical Magic repeats, realleges, and incorporates by reference all preceding allegations of this Complaint for all purposes as though fully set forth herein.

189.   At the relevant times, Practical Magic and Defendant were in an employment relationship whereby Defendant was Practical Magic's independent contractor.  By virtue of the parties' contractual and business relationship, Defendant had a duty to disclose material facts to Practical Magic.

190.   Defendant intentionally failed to disclose certain material facts to Practical Magic; disclosed some facts to Practical Magic but intentionally failed to disclose other, material facts; failed to disclose certain material facts that were known only to her and that Practical Magic could not have discovered; and prevented Practical Magic from discovering material facts.  For example, Defendant (i) concealed the fact

that she had been dismissed or otherwise separated in some way from her Ph.D. program; (ii) concealed that fact that she was inexperienced and incompetent with respect to preparing and securing site access permits; (iii) concealed that fact that the relationships Defendant represented she had and could leverage for the benefit of the production did not, in fact, exist or were far less amicable than Defendant represented; (iv) concealed that fact that she was failing to carry out her duties with respect to preparing and securing site access permits; and (v) concealed that fact that she had failed to secure specific site permits that she represented she had secured.

191.   Practical Magic did not know of these concealed facts.

192.   On information and belief, Defendant intended to deceive Practical Magic by concealing these facts.

193.   If the concealed information had been disclosed, Practical Magic reasonably would have behaved differently.  For example, if Practical Magic had known that Defendant, on information and belief, had been dismissed or otherwise separated from her Ph.D. program without receiving her degree, then Practical Magic would not have agreed to proceed with Defendant as Project Leader, especially not on a non-profit basis.  Additionally, if Practical Magic had known that Defendant was incompetent or otherwise unable to carry out her duties to the production with respect to site permits, then Practical Magic would have devoted resources to doing so and would not have had to engage in a costly rescheduling.

194.   As a direct and proximate result of Defendant's fraudulent concealment, Practical Magic has been damaged in an amount to be proven at trial.  Defendant's concealment of material facts was a substantial factor in causing Practical Magic's harm.

195.   Additionally, Defendant's actions in concealing material facts from Practical Magic were intentional, malicious, and despicable, such that Practical Magic is entitled to an award of punitive and/or exemplary damages against Defendant.

//

1

## **EIGHTH CAUSE OF ACTION**

2

### **Fraud – False Promise**

3      196.   Practical Magic repeats, realleges, and incorporates by reference all

4  preceding allegations of this Complaint for all purposes as though fully set forth herein.

5      197.   Defendant made numerous promises to Practical Magic.  For example,

6  Defendant (i) ensured Practical Magic that she would be completing her Ph.D. degree

7  soon; (ii) ensured Practical Magic that she was experienced and competent in handling

8  site access permit applications; (iii) promised to deliver on numerous, specific

9  relationships with individual authorities with influence over the permitting process; (iv)

10  promised that she had already secured access to certain sites; (v) promised that she was

11  in the process of securing access to certain sites; and (vi) promised to negotiate and

12  execute such further paperwork in good faith that Practical Magic determined was

13  necessary for the production.

14      198.   On information and belief, Defendant did not intend to perform these

15  promises when she made them.

16      199.   On information and belief, Defendant intended that Practical Magic rely

17  on these promises by agreeing to work with her, making her Project Leader, and

18  delegating permit work to her.

19      200.   Practical Magic reasonably relied on Defendant's promises.

20      201.   Defendant did not perform her promised acts.  For example, on

21  information and belief, Defendant was dismissed or otherwise separated from her Ph.D.

22  program without receiving her degree; Defendant by and large failed to deliver on her

23  promised relationships; Defendant failed to carry out her duties with respect to permit

24  applications; and Defendant failed to negotiated and execute her On-Camera Talent

25  Agreement in good faith.

26      202.   As a direct and proximate result of Defendant's false promises, Practical

27  Magic has been damaged in an amount to be proven at trial.  Defendant's false promises

28  were a substantial factor in causing Practical Magic's harm.

203. Additionally, Defendant's actions in making false promises to Practical Magic were intentional, malicious, and despicable, such that Practical Magic is entitled to an award of punitive and/or exemplary damages against Defendant.

## NINTH CAUSE OF ACTION

### Fraud – Negligent Misrepresentation

204. Practical Magic repeats, realleges, and incorporates by reference all preceding allegations of this Complaint for all purposes as though fully set forth herein.

205. As fully set forth above, even after the execution of the Attachment Agreement, Defendant continued to make representations to Practical Magic, including some of the same representations, designed to keep Practical Magic working with Defendant, or that Defendant otherwise intended for Practical Magic to rely on.  For example, Defendant (i) continued to represent that she was in the process of completing her Ph.D. degree; (ii) continued to represent that she would be able to get the production access to important cave sites; (iii) represented that she had already secured access to important cave sites; (iv) represented that she was in the process of securing access to important cave sites; and (v) represented that she was in the process of leveraging the relationships she had promised to deliver.

206. These representations made by Defendant to Practical Magic were false. On information and belief, Defendant was dismissed or otherwise separated from her Ph.D. program without receiving her degree, but did not timely disclose this fact to Practical Magic.  Defendant was not able to get the production access to the majority of important cave sites that she represented she would.  As to the majority of cave sites to which Defendant represented that she had already secured access, Defendant had not already secured access.  As to the majority of cave sites to which Defendant represented she was in the process of securing access, Defendant was not in the process of securing access.  As to the majority of relationships that Defendant had promised she could leverage to benefit the production, Defendant never delivered on the relationship.

207. Although Defendant may have honestly believed that these representations were true, Defendant had no reasonable grounds for believing the representations were true when she made them.

208. On information and belief, Defendant intended that Practical Magic rely on her representations.

209. Practical Magic reasonably relied on Defendant's representations.

210. As a direct and proximate result of Defendant's negligent misrepresentations, Practical Magic has been damaged in an amount to be proven at trial. Defendant's negligent misrepresentations were a substantial factor in causing Practical Magic's harm.

## TENTH CAUSE OF ACTION

### Negligence

211. Practical Magic repeats, realleges, and incorporates by reference all preceding allegations of this Complaint for all purposes as though fully set forth herein.

212. At the relevant times, Practical Magic and Defendant were in an employment relationship whereby Defendant was Practical Magic's independent contractor. By virtue of the parties' contractual and business relationship, Defendant had a duty to carry out the tasks assigned to her by Practical Magic reasonably, diligently, and consistently with prevailing standards in the entertainment industry.

213. Defendant breached her legal duties to Practical Magic in several ways. For example, among other negligent conduct, Defendant (i) failed to be forthcoming about her academic credentials and level of influence; (ii) misrepresented herself, her relationships, her experience, her competence, and her expertise; (iii) failed to carry out tasks that had been clearly assigned to her by Practical Magic; (iv) misrepresented the status of tasks that Practical Magic had assigned to her; (v) failed to be forthcoming about her inability to secure critical site access permits; (vi) behaved unreasonably and unprofessionally toward other members of the cast and crew; (vii) engaged in sexually

1  based misconduct toward multiple members of the production staff; and (viii) neglected
2  the safety and wellbeing of crew members under her care.

3      214.   Therefore, Defendant was negligent in carrying out her duties to Practical
4  Magic.

5      215.   As a direct and proximate result of Defendant's negligence, Practical
6  Magic has been damaged in an amount to be proven at trial.  Defendant's negligence
7  was a substantial factor in causing Practical Magic's harm.

8                    **ELEVENTH CAUSE OF ACTION**
9            **Intentional Interference with Contractual Relations**

10     216.   Practical Magic repeats, realleges, and incorporates by reference all
11  preceding allegations of this Complaint for all purposes as though fully set forth herein.

12     217.   There was a contract between Practical Magic and third-party Folklight—
13  the Folklight Fiscal Sponsorship Agreement.  (*See* Exhibit B.)  There was also a
14  contract between Folklight and the John Templeton Foundation, for which Practical
15  Magic was a third-party beneficiary—the JTF Grant Agreement.  (*See* Exhibit C.)

16     218.   Defendant knew about both of these contracts.

17     219.   Defendant's conduct has prevented performance under both of these
18  contracts and/or made performance more expensive or difficult.  For example,
19  Defendant's conduct has caused the John Templeton Foundation to withhold the
20  remainder of its grant funding pursuant to the JTF Grant Agreement, thereby
21  preventing Folklight from funding the Series pursuant to the Folklight Fiscal
22  Sponsorship Agreement.  Additionally, Defendant's refusal to acknowledge Practical
23  Magic as the holder of production, distribution, and image rights in the Series has
24  prejudiced the completion and delivery of the Series.

25     220.   On information and belief, Defendant intended to disrupt the performance
26  of these contracts and/or knew that disruption of performance was substantially certain
27  to occur.

28

221.   As a direct and proximate result of Defendant's interference, Practical Magic has been damaged in an amount to be proven at trial.  Defendant's interference was a substantial factor in causing Practical Magic's harm.

222.   Additionally, Defendant's actions in tortiously interfering were intentional, malicious, and despicable, such that Practical Magic is entitled to an award of punitive and/or exemplary damages against Defendant.

## TWELFTH CAUSE OF ACTION

### Intentional Interference with Prospective Economic Advantage

223.   Practical Magic repeats, realleges, and incorporates by reference all preceding allegations of this Complaint for all purposes as though fully set forth herein.

224.   Practical Magic and Folklight, as well as, by extension, Practical Magic and the John Templeton Foundation, were in economic relationships that probably would have resulted in economic benefits to Practical Magic—among other benefits, the remainder of the John Templeton Foundation's grant funding.

225.   Defendant knew of Practical Magic's relationships with Folklight and the John Templeton Foundation.

226.   Defendant engaged in fraudulent, negligent, or otherwise wrongful conduct as fully set forth above.

227.   By engaging in this conduct, on information and belief, Defendant intended to disrupt Practical Magic's economic relationships with Folklight and the John Templeton Foundation and/or knew that disruption of those relationships was substantially certain to occur.

228.   Practical Magic's relationships with Folklight and the John Templeton Foundation were, in fact, disrupted.  Among other disruptions, the John Templeton Foundation has—based on Defendant's misconduct—refused to release the remainder of its grant funding to Folklight, preventing Folklight from distributing that funding to Practical Magic.

COMPLAINT

229.   As a direct and proximate result of Defendant's interference, Practical Magic has been damaged in an amount to be proven at trial.  Defendant's interference was a substantial factor in causing Practical Magic's harm.

230.   Additionally, Defendant's actions in tortiously interfering were intentional, malicious, and despicable, such that Practical Magic is entitled to an award of punitive and/or exemplary damages against Defendant.

### THIRTEENTH CAUSE OF ACTION

### Negligent Interference with Prospective Economic Advantage

231.   Practical Magic repeats, realleges, and incorporates by reference all preceding allegations of this Complaint for all purposes as though fully set forth herein.

232.   Practical Magic and Folklight, as well as, by extension, Practical Magic and the John Templeton Foundation, were in economic relationships that probably would have resulted in economic benefits to Practical Magic—among other benefits, the remainder of the John Templeton Foundation's grant funding.

233.   Defendant knew or should have known of Practical Magic's relationships with Folklight and the John Templeton Foundation.

234.   Defendant knew that these relationships would be disrupted if she failed to act with reasonable care.

235.   Defendant failed to act with reasonable care in carrying out her duties and obligations to the production.

236.   Defendant engaged in wrongful conduct through breach of contract, fraud, false promises, and tortious interference.

237.   Practical Magic's relationships with Folklight and the John Templeton Foundation were, in fact, disrupted.  Among other disruptions, the John Templeton Foundation has—based on Defendant's misconduct—refused to release the remainder of its grant funding to Folklight, preventing Folklight from distributing that funding to Practical Magic.

238.   As a direct and proximate result of Defendant's interference, Practical Magic has been damaged in an amount to be proven at trial.  Defendant's interference was a substantial factor in causing Practical Magic's harm.

## FOURTEENTH CAUSE OF ACTION

### Unjust Enrichment

239.   Practical Magic repeats, realleges, and incorporates by reference all preceding allegations of this Complaint for all purposes as though fully set forth herein.

240.   As set forth fully above, Defendant engaged in wrongful conduct, including breach of contract, fraud, false promises, and tortious interference.

241.   As a result of Defendant's wrongful conduct, and in reliance on Defendant's false representations, Practical Magic conferred significant financial benefits on Defendant.  Specifically, Practical Magic paid Defendant at least $45,000 of her salary in reliance on Defendant's apparent agreement to the terms of her production paperwork.

242.   Additionally, Practical Magic agreed to waive its producer's fee, to have all of its employees work for reduced rates; and performed significant work and devoted resources toward the Series, in reliance on Defendant's apparent agreement to the terms of her production paperwork.  If Defendant is able to successfully disavow her On-Camera Talent Agreement, and take control of the Series, then these financial benefits will have been unjustly taken from Practical Magic and conferred on Defendant.

243.   Accordingly, Defendant has been unjustly enriched at the expense of Practical Magic in an amount to be proven at trial.

## FIFTEENTH CAUSE OF ACTION

### Unfair Business Practices (Bus. & Prof. Code § 17200 *et seq.*)

244.   Practical Magic repeats, realleges, and incorporates by reference all preceding allegations of this Complaint for all purposes as though fully set forth herein.

245.   As set forth fully above, Defendant engaged in wrongful business activities in violation of federal and/or California law.

246.   California Business & Professions Code § 17200, *et seq.*, prohibits businesses from engaging in any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue, or misleading advertising, and was designed to protect competitors and consumers from illegal, fraudulent, or unfair business practices.

247.   Defendant has engaged in fraudulent, unfair, and unlawful business practices and knowingly misrepresented material information to Practical Magic and third parties.

248.   As a result of the fraudulent, unfair, deceptive, and/or unlawful acts set forth herein, Defendant has reaped and continues to reap unfair benefits and unlawful profits at the expense of Practical Magic.

249.   As a direct and proximate result of the unfair and illegal practices of Defendant, Practical Magic is entitled to equitable relief including full restitution and/or disgorgement of all benefits that have been unlawfully obtained by Defendant as a result of the business acts and practices described herein.

*        *        *

## **PRAYER FOR RELIEF**

**WHEREFORE, PLAINTIFFS PRAY RELIEF AS FOLLOWS:**

1.     To enter an order in favor of Plaintiffs for each Cause of Action asserted herein;

2.     For all damages available in law and according to proof at trial;

3.     For exemplary and punitive damages;

4.     For pre- and post-judgment interest to the extent permitted by law;

5.     For reasonable attorneys' fees and court costs to the extent permitted by law;

6.     For injunctive relief against Defendant further attempting to interfere with the production of the Series or Plaintiffs' rights in connection therewith;

7.     For specific performance requiring Defendant to comply with her obligations under the Attachment Agreement;

8.     For declaratory relief that Defendant's conduct created implied-in-fact assent to the terms of the On-Camera Talent Agreement; and

9.     For all such other relief that the Court determines to be just and proper.

**<u>DEMAND FOR JURY TRIAL</u>**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Practical Magic demands a trial by jury on all issues so triable.

DATED: June 1, 2023          **ZWEIBACK, FISET & ZALDUENDO, LLP**


 /s/ *Scott D. Tenley*
SCOTT D. TENLEY
WILLIAM M. ODOM

Attorneys for Plaintiffs
**PRACTICAL MAGIC, LLC and ANGEL
VALLEY PRODUCTIONS, LLC**